ALLIED ARTISTS PICTURES CORP., Avco Embassy Pictures Corp., Buena Vista Distribution Co., Inc., Columbia Pictures Industries, Inc., Metro Goldwyn Mayer, Inc., Paramount Pictures Corp., Twentieth Century Fox Film Corp., United Artists Corp., Universal Pictures Division of Universal City Studios, Inc., Universal Film Exchanges, Inc., Warner Bros., Inc., and Warner Bros. Distributing Corp., Plaintiffs,

v.

James A. RHODES, Governor, State of Ohio; Ted W. Brown, Secretary of State of Ohio; Vernal G. Riffe, Jr., Speaker of House of Representatives; and Richard F. Celeste, Lt. Governor, Ohio Senate, Defendants.

No. C-2-78-1031.

United States District Court, S. D. Ohio, E. D.

July 10, 1980.

Earl F. Morris, Harry Wright, Columbus, Ohio, Alan Dershowitz, Cambridge, Mass., Louis Nizer, Barbara Scott, William Nix, New York City, for plaintiffs.

Richard Firestone, Paul Eklund, Eugene McShane, Asst. Attys. Gen., State of Ohio, Columbus, Ohio, for defendants.

## OPINION

DUNCAN, District Judge.

"Blind bidding" is a term used in the motion picture industry to describe the licensing of a motion picture to a theater owner without the owner's first viewing the picture. Blind bidding and other practices by which motion picture producers and distributors license their product to exhibitors

have been controversial and subject to varying degrees of governmental scrutiny at least since the 1940's, when the Supreme Court was asked to review a far-reaching judicial decree regulating them. *United States v. Paramount*, 334 U.S. 131, 157, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948). That decree permitted a theater owner to reject 20% of the films licensed by blind bidding. Although at that time relatively few new films were blind bid, the practice increased steadily during the ensuing decades.

In 1968 a new consent decree imposed a more stringent restriction, limiting to three the number of films which could be blind bid per year. When that consent decree expired in 1975, the number of films blind bid each year increased rapidly.

These events paralleled an increasing concentration of production and distribution in a few major companies while theater ownership remained relatively less concentrated. Exhibitors, finding themselves with diminishing clout in bargaining for licenses, complained that the producers and distributors of motion pictures were unfairly using their increasing market power to exact onerous bargaining terms. It was amidst these developments that the Ohio General Assembly enacted a bill intended to answer the complaints of exhibitors by prohibiting blind bidding, restricting the use of certain other licensing practices, and setting up a procedure for the open, orderly licensing of motion pictures in Ohio.

The major producers and distributors of motion pictures joined together to bring this action against the Governor of Ohio challenging the Ohio enactment as unconstitutional. Citing the increasingly high costs of production and distribution of motion pictures together with the small cadre of extremely popular motion picture professionals, plaintiffs contend their practices are entirely reasonable and necessary to the presentation of excellent and financially successful motion pictures. They claim the Act violates the Due Process Clause of the Fourteenth Amendment, the First Amendment, the Commerce Clause, and, as implicated by federal preemption in the areas of copyright and antitrust, the Supremacy Clause of the United States Constitution. The Court holds that the Ohio Act survives constitutional attack.

Before trial, the Court denied defendant's motion to dismiss the case for lack of jurisdiction and to abstain from exercising its jurisdiction but noted that these issues would be re-examined against the clearer factual setting afforded by trial.

Below are the facts as found after trial, the Court's re-examination of the questions concerning jurisdiction and abstention, and the Court's conclusions of law on each of the constitutional challenges.

## I. *Findings of Fact*

### A. *The Parties*

The plaintiffs in this action create, produce, and/or distribute motion pictures and own copyrights or copyright licenses giving them the right to license their films for exhibition within the State of Ohio and throughout the United States.

Plaintiffs Avco Embassy Pictures Corp. and Twentieth-Century Fox are corporations organized and existing under the laws of the State of Delaware with their principal places of business in the State of California. Plaintiff Buena Vista Distribution Co., Inc., the exclusive distributor for Walt Disney Productions, is a corporation organized and existing under the laws of the State of California with its principal place of business in the State of California. Plaintiffs Columbia Pictures, Inc., United Artists Corporation and Paramount Pictures Corporation are corporations organized and existing under the laws of the State of Delaware with their principal places of business in the State of New York. Plaintiff Metro-Goldwyn-Mayer, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of California. Plaintiff Universal Pictures division of Universal City Studios, Inc. and Universal Film Exchanges, Inc. are corporations organized and existing under the laws of the State of Delaware with their principal places of business in the States of Cali-

fornia and New York, respectively. Plaintiff Warner Brothers, Inc. and Warner Brothers Distributing Corporation are corporations organized and existing under the laws of the States of Delaware and New York, respectively, with their principal places of business in the State of California.[1]

The defendant is James A. Rhodes, Governor of the State of Ohio.[2]

## B. *The Case*

On June 22, 1978, the Ohio General Assembly enacted Amended Substitute House Bill 806 and on July 23, 1978, defendant Governor James A. Rhodes signed the bill into law. A.S.H.B. 806 added §§ 1333.05, 1333.06 and 1333.07 (hereafter referred to as "the Act") to the Revised Code of Ohio, to become effective on October 23, 1978. The Act is intended to regulate the manner in which motion pictures are distributed for exhibition by motion picture theaters in the State of Ohio.

Plaintiffs ask the Court to declare the Act unconstitutional and to enjoin its enforcement.

## C. *The Motion Picture Industry*

The plaintiffs' several challenges to the Act's constitutionality require the Court to make findings of fact concerning the Act's impact on the motion picture industry. In order to understand the law's impact, it is first necessary to understand the nature of the industry. The Court's findings in this regard are set forth below.

The motion picture industry is a relatively young industry with its origin in the 1920's. Since that time it has developed a fairly unique structure. The production and distribution arm of the film industry has become increasingly concentrated in a small number of major companies.

Plaintiff MGM withdrew from the distribution of motion pictures in the early or mid-1970's. The remaining plaintiffs produce and distribute a substantial majority of all films in the domestic market. In 1978 the plaintiffs garnered 94.4% of industry revenues. The remainder of films in the industry are produced and/or distributed by foreign companies or by small companies known in the trade as "independents."

Prior to 1948, the major distributors also owned many of the nation's leading theaters. After *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), distributors were required to divest themselves of their theaters, *United States v. Paramount Pictures, Inc.,* 85 F.Supp. 881 (S.D.N.Y.1949), and hence the exhibition arm of the industry has remained in other hands. Currently, none of the plaintiffs owns or operates theaters for the commercial exhibition of motion pictures in Ohio.

The exhibition arm is considerably less concentrated. Theaters are owned individually or in regional or national chains. Plaintiffs' pictures are not sold. Rather, producer-distributors enter into licensing arrangements with theater owners in order to have their works exhibited to the public.

Stemming from the bifurcation of the industry affected by the *Paramount* consent decrees is an unusually mutually-dependent relationship between producer-distributors and exhibitors. The plaintiffs create a product that depends on the exhibitors for its outlet: theater owners—the exhibitors of motion pictures—control the only available access that plaintiffs have to theater audiences. Conversely, producer-distributors control the quantity and quality of the product available to exhibitors, who consequently depend heavily on the plaintiffs for production of films to show in their theaters. As with many symbiotic relationships,

---

1. By order of the Court dated March 15, 1979, Allied Artists Pictures Corp., one of the plaintiffs in this action, was allowed to withdraw from the lawsuit and is no longer a party.

2. By order of the Court dated June 22, 1979, defendants Riffe, Brown and Celeste, the

Speaker of the House, former Secretary of State and former Lieutenant Governor, respectively, were dismissed from this action. *Allied Artists Corp. v. Rhodes,* 473 F.Supp. 560 (S.D. Ohio 1979).

the parties to it find their interests at once coincide and conflict. Without the cooperation of the exhibitors, producer-distributors would be without the major market for their goods. Without the cooperation of the producer-distributors, exhibitors would be haunted by the spectre of the "dark screen." Thus, they depend upon one another for the benefit of all in turning a profit.

At the same time, the two arms of the industry are at odds when it comes time to divide up the returns from the exhibition of a motion picture. That is done by bargaining for terms of a licensing agreement.

Competition within the industry is complicated by this relationship. As would be expected, producer-distributors compete among themselves for the best theaters and exhibitors compete among themselves for the best films. In addition to that, those in the industry speak of a further wrinkle of "competition" between a producer-distributor and its licensee, the theater owner, for the best licensing terms.

The motion picture industry is a high risk, high profit business. The cost of producing a motion picture today is high and becoming more so as the producers strive for increasingly spectacular films, which they deem necessary to compete with television. Production costs of $1 million are considered low budget; at least two of the 1978 Christmas season releases cost over $25 million each. The average cost of all 1978 releases was approximately $5.6 million each. Production costs represent what is called in the industry the "negative cost." Negative costs have increased rapidly (300%) in the last several years.

Plaintiffs' films are distributed nationally, in varying patterns, through an elaborate network. Distribution costs often equal or exceed those of production. A typical motion picture must recoup at least twice its production costs before it begins to show a profit for the distributor.

The nature of the product makes it difficult to predict the profitability of a motion picture. The producer-distributors attempt to share this risk by obtaining favorable licensing terms from exhibitors.

## D. *The Licensing Procedure*

Before passage of the Act, licensing occurred through either competitive bidding or negotiation. In addition to the division of box office receipts, terms of a license agreement quite often included a "guarantee"—a sum representing a minimum film rental payment that the exhibitor guarantees he will pay the distributor regardless of the financial success of the movie; an "advance"—the amount of film rental the exhibitor will pay the distributor in advance of the release; the geographical market area to be exclusive to that exhibitor; and the length of the "run"—the number of weeks the exhibitor will show the picture.

The practice evolved whereby a producer-distributor would notify all the exhibitors in a given area of a forthcoming film, accompanied by certain information about the film, and request bids on suggested terms. Theater owners then submitted their bids, listing the amount of guarantee, if any, the amount of an advance, if any, and a division of box office receipts they offered, along with other terms. The submitted bids were accepted or rejected by the distributors.

Plaintiffs reserved the right to reject all bids if none was considered adequate. When this happened, the bidding process either began anew, or the distributor entered into negotiation with individual theaters to arrive at mutually agreeable terms. Ultimately a license agreement was entered into between the distributor and each theater chosen to exhibit the particular film.

The production of a motion picture is a time-consuming process, taking anywhere from several months to several years to complete. The plaintiffs' top executives normally decide whether to make a movie, then the project is turned over to the production branch for hiring of actors, directors, and technical personnel and the preparation of a production schedule.

The plaintiffs generally have complete control over the schedule of production and the timing of the film's release. They gen-

erally set the release date or dates sometime after principal photography begins.

Plaintiffs usually prefer to release a film shortly after completion of production. There are several reasons for this desire. The first concerns film financing. There are a variety of sources for financing motion pictures: private investors, banks, and internally generated company funds. Funds borrowed to finance motion picture production carry an actual interest rate generally equal to or exceeding the prime rate; funds obtained from internally generated sources carry imputed interest costs. Interest accumulates every day the film is held without exhibition and continues to accumulate until a film recoups its negative and distribution costs.

Other reasons for immediate release are less tangible. Plaintiffs fear they will create an impression in the film community that they are holding a film back because there is something wrong with it. Plaintiffs also prefer prompt release of films with currently relevant subject matter.

If plaintiffs make licensing arrangements during production, they can arrange to have playdates booked with individual theaters as soon as a film is completed. Therefore the industry evolved the practice of licensing pictures while they are still in production. This practice required that an exhibitor's decision about whether to license a film hinge on whatever information the producer-distributor made available to him about the forthcoming film.

Under prior practice, when a final print[3] was available at the time of licensing, the picture ordinarily was "trade screened"[4] for interested exhibitors prior to the bidding or negotiating process. Indeed, the plaintiffs generally prefer to do so. However, when a final print was not available at the time the licensing process began, exhibitors made offers on the basis of the information available at that time such as the names of principal actors, directors and other key people involved with the picture and a synopsis of the plot. Plaintiffs occasionally furnished attractive advertising brochures describing forthcoming films. When pictures were derived from published novels, plays and other movies, these materials were likewise available to exhibitors.

There exists a great deal of controversy over the adequacy of such information in assessing a film. Exhibitor witnesses testified, and I find, that the information given them for bidding purposes was inadequate and sometimes misleading and that they can more readily assess the potential of a movie for their theaters by themselves viewing it in full.

### E. Blind Bidding

A film that is not trade screened prior to licensing is "blind bid."[5]

Contrary to plaintiffs' characterization of blind bidding as a "long established" trade practice, the testimony at trial demonstrated that this practice, though known in the 1930's and noted by the *Paramount* trial court in 1946, 66 F.Supp. 323, 350 (S.D.N.Y. 1946), was infrequently used before the 1960's. Yet for a number of reasons the practice of blind bidding has increased.

In 1968, a number of the plaintiffs entered into a stipulation with the United States Department of Justice to limit to three the number of films which they could

---

**3.** "Final print" is a term used in the industry for the completed motion picture from which copies are made for distribution to theaters.

**4.** "Trade screening" is used herein as defined by the Ohio Act to mean the showing of a motion picture to interested exhibitors prior to bidding, offering terms, accepting bids, or agreeing to terms for licensing that picture. *See* R.C. 1333.05(H) and(I).

**5.** The plaintiffs suggest that the Court use the more neutral term "advance licensing" to refer to this bidding process. Although neither term satisfactorily describes the process, I have selected "blind bidding" to refer to bidding without prior trade screening, since it appears to be more widely used in the industry and since it more accurately describes the situation of an exhibitor offering terms on a picture he has not seen. "Advance licensing," on the other hand, is used in this opinion to refer to the licensing of a film with or without screening before the final release print is available.

blind bid per year.[6] The parties further stipulated that licenses for certain pictures which had been blind bid could be cancelled by the exhibitor within 48 hours after viewing the motion picture. When the stipulation expired in early 1975, blind bidding increased and by 1977, the year that the subject bill was introduced in the Ohio legislature, the plaintiffs were blind bidding from 60% (United Artists) to 91% (Columbia) of their first-run releases.

No one speaks enthusiastically about blind bidding. Rather, it is considered by plaintiffs to be a necessary tool to the profitable marketing of their product.

Universal prefers to trade screen if a print is available. Tr. VII–105. For a number of years, United Artists chose as a matter of policy not to blind bid. Buena Vista conceded that blind bidding actually had adverse effects upon their business, but felt it necessary in light of the general industry practice to resort to blind bidding in order to be assured of booking their films in desirable theaters. Other distribution witnesses noted that competition among distributors compelled them to join in the practice in order to assure that they could license their films before all the suitable first-run theaters were already booked by other blind bidding companies. Indeed, some of the plaintiffs' own blind bid solicitations recite that they are reluctant to resort to such a practice but that it is deemed necessary in light of the fact that exhibitors would otherwise fill their screens with the products of their blind bidding competitors. Exhibit 2–G.

Another reason for blind bidding is the impact of television on national marketing strategy. The motion picture industry has made increasing use of the "wide release" pattern of distribution: a simultaneous release of the same motion picture in many theaters across the country. With certain types of films, the wide release has afford-

ed the best financial return. An efficient medium for advertising and promoting a wide release film is national network television. If a picture is to appear nationwide on the same date, a network television commercial can publicize that fact to a high percentage of the national market. Advertising strategy begins long before production of a motion picture is completed. This is particularly so with regard to network television buys, which often must be made from one to nine months in advance of the date the commercial will run.

Other forms of advertising are generally less expensive, less efficient, and can be obtained on considerably shorter notice. The local promotion and advertising of a film entails posters, movie trailers, ads in various newspapers and magazines and the use of local radio and television. Some local advertising is tied to particular theaters and playdates, while national network television is not.

Advance licensing enables the plaintiffs to plan their advertising campaigns with a number of license agreements in place.

Promotion of a film occurs additionally through sale of ancillary products, such as dolls, T-shirts and record albums, based on a film's theme or characters. Planning and manufacture of such products occurs during film production so that they too may be marketed in connection with the release of the film.

Thus, the practice of blind bidding, by assuring contractual agreements with theaters to show the picture on the dates specified, enables producer-distributors to release a film very soon after completion. It permits producer-distributors to plan their distribution arrangements and coordinate the release with advertising and promotion campaigns.

On the other hand, the practice of blind bidding works to exhibitors' disadvantage

---

**6.** This stipulation, covering a two-year period beginning January 1, 1969, was subsequently extended for two additional two-year periods and expired January 1, 1975. *United States v. Paramount Pictures*, Civil Action 87–273 (S.D. N.Y. Aug. 14, 1968). The signatory parties to

the decrees were Columbia Pictures Corp., MGM Inc., National General Corp., Paramount Pictures Corp., Twentieth Century-Fox Film Corp., United Artists Corp., Universal Pictures, and Warner Brothers-Seven Arts Distributing Corp.

because it compels them to commit playing time in advance of their viewing a film to assess its potential profitability and its suitability for their particular clientele.

### F. Guarantees

The price an exhibitor pays for the license of a film takes the form of "film rental," which is a percentage of box office receipts. From the total box office receipts the exhibitor subtracts a predetermined sum representing his expenses, called a "house figure" or "house expense." The balance constitutes the net receipts and is divided between the exhibitor and the distributor at a fixed percentage, generally "90/10," the distributor receiving a maximum of 90% and the exhibitor retaining a minimum of 10%. The distributor's minimum share is assessed in a declining ratio during the period of the run, that is, during the period that a film is being shown at the theater.

This arrangement is best explained by hypothetical illustration. Thus, if a theater grosses $10,000 in box office receipts for a one-week engagement, and it deducts therefrom a house figure of $4,000, the remaining net receipts of $6,000 are divided in the 90/10 ratio: the theater owner turns over $5,400 as film rental to the distributor and retains $600 profit.

For longer runs, the size of the box office gross usually decreases and the distributor's proportion of the net receipts diminishes over time. Thus, a typical arrangement calls for the distributor to receive a minimum of 70% of the net receipts in the first week, 60% the second week, 50% the third, 47% the fourth and fifth and the balance of the run at 35%.

A "guarantee" is the industry shorthand expression for a guaranteed minimum payment applied toward the film rental that an exhibitor promises to pay the distributor. It is not refundable, and, unlike the film rental, it is not based on a division of box office receipts.

In the hypothetical given above, for example, if the theater owner had contracted to pay a guarantee of $5,000, his guarantee would be well within the film rental of $5,400 payable to the distributor. In the event that the motion picture fares poorly at the box office, the distributor still receives the guarantee of $5,000; the film rental percentage figure, which would yield a lesser sum, is disregarded. In the example above, if the box office receipts total only $9,000, the net receipts of $5,000 would equal the amount of guarantee, and the exhibitor will have no profit on the showing of the film. If the box office gross is even less—say $8,000—the exhibitor must still pay the $5,000 guarantee, taking a loss of $1,000.

The guarantee serves several functions. First, since the guarantee is usually required two weeks before a film is shipped to the theater, it is a handy technique for collection from delinquent exhibitors. Second, it is one of the terms which may vary in exhibitor's bids, and which plaintiffs may consider in evaluating the bids for the best terms. In particular, a large guarantee is occasionally used as a device to break into an existing market by new exhibitors whose lack of known track records would otherwise preclude them from favorable consideration by film distributors. These purposes, however, are secondary.

Primarily, the guarantee is used as a risk-shifting device. A distributor who has secured substantial guarantees from exhibitors diminishes any gamble which he takes on the commercial success of the motion picture and transfers some of this risk to the exhibitor. There have been instances in which the plaintiffs have received guarantees sufficient to cover production costs months in advance of the completion of a motion picture. By virtue of the guarantee, the exhibitor assumes the risk that the net receipts will exceed the amount of the guaranteed minimum payment he has promised the distributor.

### G. The Ohio Act

The statutory sections enacted by the Ohio General Assembly in A.S.H.B. 806 regulate licensing procedures within the State of Ohio as follows:

§ 1333.05 [Definitions.]

As used in sections 1333.05 to 1333.07 of the Revised Code:

(A) "Theater" means any establishment in which motion pictures are exhibited regularly to the public for charge.

(B) "Distributor" means any person engaged in the business of renting, selling, or licensing motion pictures to exhibitors.

(C) "Exhibitor" means any person engaged in the business of operating a theater in this state.

(D) "Exhibit" or "exhibition" means showing a motion picture to the public for a charge.

(E) "Invitation to bid" means a written or oral solicitation or invitation by a distributor to one or more exhibitors to bid or negotiate for the right to exhibit a motion picture in this state.

(F) "Bid" means a written or oral proposal by an exhibitor to a distributor, which proposal is in response to an invitation to bid or negotiate and states the terms under which the exhibitor will agree to exhibit a motion picture in this state.

(G) "License agreement" means any contract between a distributor and an exhibitor for the exhibition of a motion picture by the exhibitor in this state.

(H) "Trade screening" means the showing of a motion picture by a distributor in one of the five municipal corporations within this state having the largest population which showing is open to any exhibitor interested in exhibiting the motion picture.

(I) "Blind bidding" means bidding, negotiating, offering terms, accepting a bid, or agreeing to terms for the purpose of entering into a license agreement prior to a trade screening of the motion picture that is the subject of the agreement.

(J) "Run" means the continuous exhibition of a motion picture in a defined geographic area for a specified period of time. A "first run" means the initial exhibition of a motion picture in a designated geographic area for a specified period of time. A "subsequent run" means any continuous exhibition of a motion picture in a designated geographic area for a specified period of time after the first run.

§ 1333.06 [Certain practices of distributors prohibited; effect on license agreements.]

(A) No distributor shall engage in blind bidding.

(B) No distributor shall condition the granting or execution of a license agreement on a guarantee of a minimum payment to the distributor, if the exhibitor is required by the license agreement to make any payment to the distributor that is based on the attendance or the box office receipts at a theater at which the motion picture is exhibited.

(C) No distributor shall condition the granting or execution of a license agreement on the exhibitor's advancing, more than fourteen days prior to his first exhibition of a motion picture, any money that is to be used as security for the exhibitor's performance of the license agreement or is to be applied to any payments that the exhibitor is required by the agreement to make to the distributor.

(D) Any provision of a license agreement that waives any of the prohibitions of, or fails to comply with, this section or section 1333.07 of the Revised Code is void and unenforceable. Any license agreement that fails to comply with this section and section 1333.07 of the Revised Code is voidable by the exhibitor, if the exhibitor gives the distributor written notice, prior to the exhibitor's first exhibition of the motion picture that is the subject of the agreement, of his intent to have the agreement voided.

§ 1333.07 [Invitations to exhibitors to bid; inspection, notice.]

(A) If bids are solicited from exhibitors for the purpose of entering into a license agreement, the invitation to bid shall specify:

(1) The number and length of runs to which the invitation to bid applies;

(2) Whether the invitation to bid applies to a first or subsequent run;

(3) The geographic area for each run;

(4) The names of all exhibitors who are being given an invitation to bid;

(5) The date, hour, and location at which the bid is required to be made;

(6) The name and address of the location where the bids will be opened, which location shall be within this state.

(B) If the motion picture that is the subject of a bid has not already been trade screened within this state, the distributor soliciting the bid shall include in the invitation to bid the date, time, and location of the trade screening of the motion picture that is the subject of the invitation to bid.

(C) Every distributor shall furnish to all exhibitors in this state reasonable and uniform notice of all trade screenings that are held within this state of motion pictures that he is distributing.

(D) All bids shall be submitted to the distributor in written form. The distributor or his agent shall open all bids at the same time and in the presence of at least one of the exhibitors, or the agent of an exhibitor, who has submitted a bid.

(E) Any exhibitor, or the agent of an exhibitor, who submits a bid for a particular run of a motion picture may, at reasonable times within sixty days after the bid is opened, examine any bid that is made for the same run of the motion picture by another exhibitor. The exhibitor may inspect the bids even if the distributor rejects all bids that are submitted. Within seven business days after a bid for a particular run of a motion picture is accepted, the distributor shall notify in writing each exhibitor who submitted a bid for that run of the motion picture of the terms of the accepted bid and the identity of the successful bidder. Any bid submitted is nonreturnable.

(F) If a distributor issues invitations to bid for a motion picture, he shall not enter into a license agreement for the exhibition of the motion picture except by means of the bidding process specified in this section. If the distributor rejects all bids submitted pursuant to an invitation to bid, he shall notify all exhibitors who submitted bids that he rejected all bids and shall issue a new invitation to bid.

The Act alters prior practice in the licensing of motion pictures as follows:

(a) It prohibits blind bidding. Thus it requires all motion pictures intended for exhibition in this state to be trade screened prior to commencement of bidding or negotiation for a license. § 1333.05(I) and .06(A).

(b) It prohibits guarantees in the following manner: a license may not be conditioned by the distributor on the payment of a guarantee if the license agreement provides for a division of box office receipts such as film rental. § 1333.06(B).

(c) It does not substantially alter prior practice with respect to advances. Under prior industry practice, advances rarely if ever were required by plaintiffs to be paid more than 14 days before a motion picture was to be shown. The statute merely imposes a requirement that the producer-distributors not alter this practice to include payment of advances any earlier than 14 days before commencement of a run. § 1333.06(C).

(d) It requires "open bidding": bids received by distributors must be opened simultaneously, exhibitors must be given notice of the opening and those who have submitted a bid must be given an opportunity to be present at the opening and to examine other submitted bids. § 1333.-07(A)(6); § 1333.07(D).

(e) It requires a distributor who has solicited bids to follow the prescribed procedure for bidding. Thus, once bids are solicited, the distributor is thereafter prohibited from licensing through negotiation. § 1333.-07(F).

(f) It requires trade screening to be held in one of the five largest cities in Ohio.

H. *Impact of R.C. 1333.05–.07 on Motion Picture Industry: In General*

Numerous legal and factual issues have been raised in this case concerning the im-

pact of the Ohio statutes on prior practice within the industry. These issues are discussed in greater detail below as they relate to the particular legal theories advanced by the plaintiffs. Certain basic effects of the new law will, however, be discussed generally here.

### 1. The Importance of Trade Screening to Assessment of Motion Pictures

Trade screening is the most effective way for an exhibitor to form an impression about a film and exercise his own judgment regarding its quality, its potential commercial success, and its suitability for the clientele which patronizes a particular theater. Ample evidence demonstrated that the information about a film available to an exhibitor under blind bidding is inadequate for this purpose and sometimes misleading.

It is clear that prediction of the commercial success of a motion picture has not and cannot be reduced to an exact science; and that even the most experienced experts in the industry cannot be certain whether a film will break box office records or be a dismal financial failure. But one's predictions are apt to be more accurate upon viewing the completed film than based on any other information. Typical of the testimony the Court heard on the value of trade screening was the succinct description offered by Charles Sugarman, a Columbus, Ohio, theater owner that:

> I cannot look at a picture . . . and say that it is going to be a success . . . I don't know of anyone who really can do [that].
>
> I can look at a picture with my years of experience and I think other exhibitors, too, who are professionals in the field, [can] look at a picture and 99 times out of

a hundred say that this is going to be a bomb, it is a very bad picture. Tr. XVI–91.

The trade screening requirement doubtless reduces the uncertainty facing an exhibitor when determining whether and on what terms a picture should be licensed.

### 2. Delay

Much has been made of the effect of the trade screening requirement to delay release of a motion picture.

There was little direct evidence of delays actually caused by the Act. Based on all the evidence heard, however, and on reasonable inferences to be drawn from that evidence, the Court finds that the ban on blind bidding and its concomitant requirement of trade screening does threaten to delay the release of certain films in certain limited circumstances.[7]

Since R.C. 1333.05–06 prohibits bidding until after trade screening, it necessarily entails that release of a completed motion picture is suspended during the time it takes to complete the bidding procedure.

However, the instances in which this suspension actually works a delay in release of a motion picture are rare. First, a delay would not occur directly as a result of the statute, but as a result of the statute in combination with delays in production, a matter over which the plaintiffs have primary control. Plaintiffs determine what the release date should be and build into their production schedule a certain amount of leeway for production delays which is usually ample to accommodate a distribution delay. For many reasons, in spite of their generally expressed preference for prompt release, plaintiffs often hold a com-

---

**7.** The Court does not credit the defendant's argument that trade screening should not delay a release because a film may be trade screened before it is completed. The statute does not specify whether a motion picture must be in final form before it is trade screened, and evidence has been introduced that for purposes of screening before the Classification and Rating Administration (CARA), trade usage has construed the term "completed motion picture" to mean a picture at some stage short of comple-

tion. There is also evidence that a film has on occasion been trade screened in a rough form. [See, e. g., Tr. IV–62, "Prophecy."] Nonetheless, the evidence is ample that for the purpose of assessing the commercial viability of a motion picture, both producer-distributors and exhibitors prefer to view the completed film as that term is understood in its plain ordinary everyday meaning, that is, after a final print is produced.

pleted film for months before releasing it. Even in those instances when the leeway is consumed by production delays, as where an Act of God destroys the set or a consummate director takes too long striving for perfection, the plaintiffs have adjusted their schedules to get the film out on its set release date by such methods as speeding up post-production operations or working overtime, or they have changed the release date and substituted another film. *See infra* note 10.

Occasionally, a film is delayed in production and is actually completed within a few days of its scheduled release date. When that occurs, the time required by the bidding process may delay a film beyond the contemplated release date.

It appears that this would only happen with a certain type of release pattern called a "wide release," involving the same day opening of a film in several hundred theaters nationwide. A wide release film, which production lags have brought down to the wire, might well be delayed in Ohio past the national release date. Even with the wide release date, however, a film is occasionally released in waves as much as a month apart. Tr. V–114. Other patterns, such as the "platform" or "roll-out" patterns, involve the intentionally selective opening of a picture in a few places in the country and a gradual distribution to other theaters in other communities. Based on such factors as its theme and expected audience, the plaintiffs determine months ahead of time what sort of release pattern would be most effective for a particular film.

Given a motion picture scheduled for a national wide release on a certain date that has undergone production delays preventing its completion until a few days before the scheduled release date, it is necessary to assess the length of the delay that might be caused by the Ohio Act. The time it takes to obtain license agreements is for the most part within the control of plaintiffs. Before the Act became effective, the bidding process itself took anywhere from a week to several months. In most cases, the period was around two to four weeks. Much of this time was consumed by plaintiffs' distribution departments evaluating bids to determine whether they were acceptable. Exhibitors, on the other hand, often submitted their bids by telephone or telegram. The longer periods were caused by a producer-distributor's rejection of submitted bids as too low in favor of rebidding or negotiation.

Because under advance licensing plaintiffs were under little pressure to complete their licensing arrangements quickly, the time it took to license films prior to the Act is a poor measure of the time that the Act will actually delay a motion picture.

At the time of trial, the statute had been in effect approximately eight months. Evidence of statutorily-caused delays was scant, perhaps because distributors had rushed to blind bid films as much as a year ahead of their scheduled release dates before the Act became effective in October 1978. There was some testimony by plaintiffs' witnesses that delays were expected to occur with several films scheduled for release in the latter half of 1979. One film expected to be delayed, "Escape from Alcatraz," was apparently completed one week before its scheduled release date and was successfully licensed in Ohio to appear on that date. The only testimony of delays which actually occurred was provided by Mr. Mancuso, Executive Vice President for marketing and distribution for Paramount Pictures, Inc.[8] He testified that two mo-

---

**8.** Other evidence relevant to alleged delays was provided by Paul Grossman, head buyer for Mid-States Theatres, Inc. Mr. Grossman's testimony shows clearly that dozens of the plaintiffs' first-run films were successfully licensed in suitable theaters in Ohio between the operative date of the Act and the time of trial. Of approximately 33 new releases licensed by Mid-States Theatres in Cincinnati during that

time, about half had been assigned national release dates. Of those, the witness could identify only one which had been delayed in Ohio, "Prisoner of Zenda." A few were exhibited in Ohio before the national release date. The time between the date of trade screening and the date of exhibition varied from ten days for "Manhattan" to over four months for "Voices." The time between the mailing by plaintiffs of

tion pictures scheduled for summer release in 1979—"Players" and "Bloodline"—suffered delays of one month each in certain markets in Ohio where they had not been blind bid prior to the effective date of the Act. "Players" is a prime example of the film described above in which a delay might occur: It suffered production delays when one of its main stars contracted hepatitis and a director broke an ankle. The final print was available on June 4, 1979, but an additional editing change was made thereafter. Its national release date was set for June 8. Paramount met the release date in major Ohio cities and in other blind bid markets across the nation, but delayed it in some smaller Ohio cities by four weeks. Tr. IV–56–60. There was no evidence that the Act has caused a delay in excess of four weeks.

Based on this evidence, the Court finds that in certain limited circumstances, the Ohio Act, working in concert with production failures, can delay a film in Ohio past its scheduled release date. Such a delay is an infrequent occurrence and is not apt to exceed four weeks.

### 3. *Increased Costs*

Another alleged effect of the statute on which plaintiffs put considerable emphasis is that of increased cost. Plaintiffs allege that the statute will cost them money, both by increasing the cost of producing and marketing their product, and by diminishing the returns on their investment at the box office.

The Ohio anti-blind bidding law has a potential for increasing the plaintiffs' production and marketing costs.

First, to the extent it may precipitate any delay in release, the statute will cause plaintiffs to incur the daily carrying charges for their investment in the film for the period of the delay. As discussed earlier, the evidence concerning the production of a motion picture from start to finish indicates that it is often a protracted endeavor with many potential problems of delay, all of which are within the control of the producers or those with whom they contract. On the other hand, the potential delay caused by the Act will rarely occur and even then will rarely exceed two to four weeks. When viewed against the average film production schedule of a year or more, the overall impact of the potential delay caused by the statutes is not appreciable.

Second, plaintiffs allege their costs will be increased by the more cumbersome mechanics of the bidding procedure itself. The testimony supports a conclusion that the plaintiffs have made some minor changes in prior procedures as a result of the new law, but that the new bidding procedures do not increase plaintiffs' distribution costs in a substantial way.

As to plaintiffs' allegations regarding lower revenues, I do find that to the extent the statute reallocates the risk of a box office failure away from exhibitors and

bid solicitations and the date bids were due after trade screening varied from eight days to a month. The longer periods did not arise by operation of the statute but were a direct result of plaintiffs' decisions.

Thus, for example, the one delayed picture, "Prisoner of Zenda," distributed by Universal, was solicited in April 1979, trade screened on May 14 and licensed by Grossman to appear in his Ohio theaters on the national release date of May 25. A few weeks before its scheduled release date, Universal unilaterally changed the Ohio date to June 15.

Mr. Grossman testified that he believed another picture, "Meatballs," appeared in Ohio a week later than it did in the rest of the country. Assuming that "Meatballs," distributed by Paramount, was indeed delayed a week in Ohio, it

is difficult for the Court to infer that its delay was caused by the Ohio statute. That film was solicited April 23, 1979, trade screened on April 28 and bid on May 7. It was not shown in Ohio until July 20. Granting Paramount a reasonable time to consider bids and award contracts, it is clear that the trade screening requirement was not the cause of the one week delay.

Similarly, "Voices" was not shown until four months after the bidding process began. Yet to include four months in assessing the time required to license a picture would be inaccurate. "Voices" was trade screened five days after bid solicitation letters were mailed and Ohio exhibitors had returned bids for it within twelve days. Other examples of bidding times under the statute may be found at Tr. XV–106–145.

onto plaintiffs, it may well decrease plaintiffs' revenues. On the other hand, this loss is no doubt offset somewhat by the higher bid terms plaintiffs get from exhibitors who bid on a trade screened motion picture. Tr. I–121–22; VII–112; VIII–70–71. I am not satisfied that plaintiffs have proved their allegations that the Act will reduce the size of audiences or seriously hamper plaintiffs' ability to plan for release at peak periods and to gear a film's release to advertising campaigns. Nor can the Court draw the further inference that lower revenues would be caused thereby.

Finally, I find insufficient support for plaintiffs' theory that anticipated higher costs and lower returns under the new law will discourage investment.

## II. Jurisdiction and Related Matters

Plaintiffs originally named several state officials as defendants in this suit alleging that actions taken by these officials in approving, certifying, and incorporating the Act into law were void by reason of the unconstitutionality of the Act. Prompted by this unusual jurisdictional posture, the defendants sought, prior to trial, to have the case dismissed for lack of jurisdiction or to have the Court abstain from exercising its jurisdiction.

The defendants stated two grounds for their jurisdictional challenges: first, that the Eleventh Amendment barred this suit for the reason that the officials are defendants in name only, the real party defendant being the State of Ohio; and second, that the plaintiffs failed to demonstrate a justiciable case or controversy as required by Article III of the United States Constitution.

The Court considered these serious contentions at length in a pretrial memorandum and order. *Allied Artists Corp. v. Rhodes*, 473 F.Supp. 560 (S.D.Ohio 1979).

### A. The Eleventh Amendment

■ Concerning the Eleventh Amendment challenge, the Court recognized that it has no jurisdiction to hear a challenge to the constitutionality of an act of the legislature brought under the guise of a suit against state officials who have no connection with enforcement of the Act. *Fitts v. McGhee*, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899). Nonetheless, the Court noted that the fiction created by *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), whereby a state officer seeking to enforce an unconstitutional statute is deemed stripped of his state-derived immunity and may be sued to enjoin the statute's enforcement arguably permitted this action to proceed against Governor Rhodes.

Viewing the facts and arguments from the standpoint called for in ruling on a motion to dismiss, the Court denied the motion to dismiss Governor Rhodes, finding tentatively that as to him, there existed both requirements necessary to trigger the *Ex parte Young* fiction: a connection with the enforcement of the Act and a real likelihood that the connection would be employed against plaintiffs' interests.

The Governor's connection with enforcement of the Act is derived from his general duty "to see that the laws of [Ohio] are faithfully executed," found in Article III, § 6 of the Ohio Constitution. Finding no connection between the other named defendants and the enforcement of the Act, the Court dismissed those defendants.

Upon examination of case law concerning the application of the *Young* doctrine in similar cases, the Court found it helpful to view the cases along a continuum and determined that this action arguably belongs on that end of the continuum where are found cases holding a sufficient likelihood that the connection would be brought to bear against a plaintiff's interests exists where a state enacts regulatory legislation creating rights and relationships of substantial public interest not readily protectible in litigation between private parties.

In stating this conclusion, the Court cautioned that its holding was tentative and would be re-examined in light of the clearer factual setting affordable by trial.

The remaining defendant in this case, Governor Rhodes, reasserted his motion to dismiss on Eleventh Amendment grounds at

the close of plaintiffs' case, and again at the close of all the evidence, asserting that the likelihood that the Governor would use his general power to enforce the Act at issue here was so tenuous that to permit this action to proceed against the Governor would convert the *Young* fiction to fantasy in this case. Tr. XV–20. Specifically, defendant asserts that this action belongs at the other end of the spectrum within that category of cases concerning statutes that merely govern rights between private parties readily resolvable by litigation between private parties. The defendant bases this argument on the premise that the statute does not ban blind bidding or any other forbidden practice altogether but permits it at the discretion of the exhibitors, since so long as exhibitors do not challenge the validity of a license agreement incorporating any of the prohibited acts, the acts may be performed. Further, the defendant argues that the only public interest at issue here is the interest in permitting exhibitors to exercise a free market judgment, and that this is satisfied without the Governor's intervention.

It is indeed disconcerting that after more than three weeks of trial, further arguments and briefing by the parties, the Court nonetheless finds itself in little better position than before to rule on this issue. Plaintiffs, who bear the burden to establish the existence of jurisdiction in this Court, presented no evidence that the Governor has attempted to use his general enforcement powers to obtain compliance with the Act. Nor did the defendants present evidence that the exhibitors have voluntarily entered into license agreements containing terms prohibited by the Act. The Act appears to be self-enforcing, and plaintiffs have apparently altered their procedures to comply with its provisions from the date it became effective. The Court is therefore redirected to the language of the statute. Ruling on the basis of the text of the Act is inherently precarious, since the facial obscurity which the Court noted earlier, 473 F.Supp. at 569, has not been significantly remedied by evidence on the Act's application. Opinion testimony by members of the industry regarding what the Act means and how it will operate was in such conflict that it was of little overall benefit to the Court. The Court is unaware of any Ohio court interpretation shedding light on this issue.

The problem arises because of the way in which the statute purports to remedy the practices it seeks to prohibit. It does this by rendering void portions of license agreements containing prohibited terms and by rendering voidable at the option of the exhibitor entire agreements violating both the section on prohibited terms and the section on bidding procedures. R.C. 1333.06(D).

Defendant asserts that the only involvement of the state mandated by the statute is to deny Ohio courts power to sanction agreements containing prohibited terms. Read in this way, the statute is self-enforcing, and merely establishes a defense to be used by exhibitors in suits brought on contracts violative of its terms.

■ To state that a statute is facially self-enforcing, however, is not to state that the statute is immunized from review by the Eleventh Amendment. As I understand *Ex parte Young* and its progeny in this area, in determining the likelihood of a Governor's acting to enforce a statute through his general powers when a statute is by its terms self-enforcing, for the purposes of ascertaining the applicability of the *Ex parte Young* fiction, the Court looks to the interests of the state in seeing the legislation enforced and to the ability of private parties to effectuate its mandate.

■ The Court spoke before of a continuum of decisions ranging from those dealing with purely private matters and those dealing with matters in which the public interest was substantial. A review of those cases and the development of the law since the Court's earlier decision has not yielded any reason persuading the Court to abandon its placement of this case on the continuum with those cases applying *Ex parte Young* to make the Governor amenable to suit.

The defendant has called the Court's attention to the case of *Shell Oil Co. v. Noel,*

608 F.2d 208 (1st Cir. 1979), in which the First Circuit Court of Appeals recently affirmed a district court's dismissal of a complaint naming the Governor and Attorney General of Rhode Island as defendants in a suit challenging a state statute regulating trade practices in the area of petroleum products. Although the district court had dismissed the state officials on Eleventh Amendment grounds, stating that they had no "connection with enforcement of the act," *id.*, at 211, the circuit court affirmed the dismissal "on the ground that there is no 'case or controversy' within Article III of the United States Constitution." *Id.*, at 210.

Regarding the Eleventh Amendment issue, the circuit court's reasoning parallels the reasoning of this Court in its earlier order. The court first restated the foundation principles of *Ex parte Young*:

> In a suit brought to have a declaration of the unconstitutionality of a state statute or to enjoin the enforcement of the statute an officer of a state is an appropriate defendant if he has some connection with the enforcement of the act. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). It is not necessary that his duty should be declared in the act which is to be enforced.

*Shell Oil, supra*, 608 F.2d at 211. Referring to Chief Judge Friendly's decision in *Gras v. Stevens*, 415 F.Supp. 1148 (S.D.N.Y.1976) (three-judge court), the court agreed that "[t]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute," and recognized that "[o]f critical importance are the nature of the statute and the state officer's connection with that statute." *Shell Oil, supra*, 608 F.2d at 211–12. Reasoning that the statute's declaration of certain acts as "unlawful" might prompt a Rhode Island court to permit the governor or attorney general to bring an equitable action to enforce the statute in the interests of the general welfare, the court acknowledged that the officers might have a sufficient connection with the statute's enforcement to be proper parties defendant in the action. *Id.*, at 212.

However, finding that this connection rested on unsettled issues of Rhode Island law, the circuit court chose to refrain from resolving the question, preferring instead to dispose of the case on Article III grounds.

I perceive no inconsistency between the reasoning of the *Shell Oil* opinion and the Court's decision in the instant case. I disagree with that opinion only insofar as it may be read to imply that a resolution of state law by state courts is a prerequisite to a decision of the federal jurisdictional issue.

Moreover, there is some evidence in the record of substantial public interests which may have been intended to be served by the statute—interests which would not be vindicated in the event that the statute is read as suggested by the defendant as permitting blind bidding, guarantees and advances at the initiative of the exhibitor. Thus, for example, the defendant has suggested, and the Court finds, that it is a reasonable inference that the statute was designed in part to rectify a perceived imbalance in bargaining power of exhibitors and producer-distributors by shifting the risk of motion picture box office failures from exhibitors to producer-distributors. This risk-shifting effect might be thwarted if exhibitors, already in a weak bargaining position vis-a-vis distributors, succumb to the temptation "voluntarily" to accept terms which disadvantage them in order to obtain films, notwithstanding the express prohibition of the inclusion of such terms in license agreements at a distributor's insistence. If such developments were observed, the Governor might find it necessary to step in to insure that the intent of the Act is realized. Likewise, extensive violations might render resolution of widespread disputes by individual contractual litigation impracticable and warrant governmental enforcement.

The defendant also argued and presented some exhibitor testimony supporting the proposition that market practices prior to the Act were driving up ticket prices at the box office and that the statute is designed in part to prohibit practices tending to en-

courage this trend. Assuming this to be a purpose of the Act, it is reasonable to conclude that the interest of the Ohio movie-going public—the consumers of films in Ohio—in reasonable ticket prices is to be served by the Act. Accordingly, there are substantial interests which the Act is designed to protect and which are not certain of vindication through private dispute resolution.

Upon closer examination of the Act, it is apparent that the Act does more than simply establish a defense to a private contract action for exhibitors or deprive state courts of jurisdiction to enforce certain contract provisions. It is trade practice legislation that prohibits certain acts *and in addition* declares what legal effect contracts specifying those acts to be performed will have. The Act contains numerous commands which are not likely to be enforced in a contract action by a distributor to enforce a license agreement with an exhibitor. Section 1333.07 sets out detailed requirements concerning the conduct of soliciting and acting on bids, many of which are never spelled out in a license agreement. Thus, for example, § 1333.07(C) provides that every distributor:

> shall furnish to all exhibitors in this state reasonable and uniform notice of all trade screenings that are held within this state of motion pictures that he is distributing.

As a matter of trade practice, a distributor is unlikely to include a term in a license agreement waiving his obligation to give notice to all exhibitors in the state of trade screenings of forthcoming films, because the trade screening itself would have occurred prior to drawing up the license agreement with a particular exhibitor. If, as defendant urges, the only remedy for violations of the Act is the right of an exhibitor to resist enforcement of an offending license agreement, substantial obstacles lie in the path of the private exhibitor seeking to remedy a violation of this provision. Assuming for the sake of argument, of course, that such a term did appear in a license agreement, then the term would be rendered void by the statute and

the exhibitor could assert its invalidity in a private suit. As plaintiffs point out, however, a distributor could give notice of trade screenings to a handful of exhibitors, knowing full well that the exhibitors with whom he entered license agreements would not be wont to complain of his failure to give notice to other exhibitors. The statute itself does not expressly provide for a cause of action for persons not party to the offending license agreement. This provision and several other provisions of § 1333.07 are not certain of vindication through private litigation.

For these reasons, I find no persuasive grounds to depart from my earlier holding that *Ex parte Young* does apply to this action to remove the Eleventh Amendment barrier and render Governor Rhodes amenable to suit.

### B. *Case or Controversy*

■ In its pretrial memorandum and order, the Court likewise reserved for final ruling the question whether this case satisfies Article III justiciability requirements sufficient to give the Court jurisdiction. 473 F.Supp. at 571.

Nothing in the record before me nor subsequent developments of the law, however, persuades me to depart from the tentative holding there set forth. The legal principle governing a case such as this was stated earlier by the court:

> [A]n actual threat of enforcement by state officials is not required for justiciability where, as in this case, the statute is mandatory, self-enforcing, and results in immediate economic injury.

*Id.*, at 570; relying on *Lake Carriers' Association v. MacMullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923). The more recent decision of the Supreme Court in *Babbitt v. Farm Workers*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) reinforces that principle.

Facts which the Court assumed for purposes of ruling on the defendant's motion to dismiss have been borne out at trial.

The statute prohibits certain acts and prescribes others. Its commands have been shown to have a direct and substantial impact on the plaintiffs' established business practices. The plaintiffs have assumed responsibility for compliance with its terms as of its effective date. As interpreted above, the Act does impose an obligation on the plaintiffs to comply with its terms, notwithstanding that no actual threat of enforcement by state officials has been made. By virtue of its self-enforcing nature the Act· does work an immediate impact on the plaintiffs, and accordingly I conclude a live controversy exists in this case.

### C. Abstention

■ The Court similarly finds no reason to alter its ruling refusing to abstain from exercising its jurisdiction in this action. 473 F.Supp. at 572. Although considerable clarification might result from a state court construction of the operation, impact and purpose of the statute, and such a construction might benefit the Court in determining the precise outlines on the issues before it, the Court is unaware of any pending case in state court apt to produce such a construction, nor does the Court believe that such a construction would avoid or significantly modify the federal issues presented to the Court. *Babbitt v. Farm Workers, supra,* 442 U.S. at 306, 99 S.Ct. at 2313; *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Harris County Comm'rs. v. Moore,* 420 U.S. 77, 84, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975).

### III. Due Process [9]

■ It is clear that the Court's inquiry need not extend to any of the other constitutional theories advanced by the plaintiffs if the Ohio Act does not meet the threshold test of rationally relating to a legitimate governmental objective. *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). Plaintiffs claim the Act does not relate rationally to any legitimate governmental interest. It is appropriate at this juncture to examine plaintiffs' claim and discuss the purposes the Act was designed to serve and its relation to those purposes.

Substantive due process requires economic regulation to meet a fairly minimal standard:

> So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.*

*Id.* at 537, 54 S.Ct. at 516. The due process analysis lies at the foundation of further constitutional inquiry. Therefore, the following discussion represents findings and conclusions relevant to later discussion as well as to the due process claim.

The Governor has asserted a number of purposes the Act was intended to serve. The Governor contends that the Act was a legislative response to anticompetitive and abusive motion picture distribution practices in which Ohio exhibitors were forced to participate, and that it serves the state's legitimate interests in promoting a competitive economy generally, and in particular in promoting the widest possible dissemination of information (through motion pictures, in this case) from competitive sources, which the United States Supreme Court has held

---

9. Plaintiffs' complaint, in Count III, alleges that the Ohio statute violates the Equal Protection Clause as well as the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Although the plaintiffs do continue to assert that the Act has no rational relation to any legitimate state interest, because they have not pursued the equal protection challenge, and because the Court can conceive of no grounds in support of such an argument, the Court declines to consider the equal protection claim further.

to be essential to the welfare of the public. *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1944). Further, the Governor asserts the Act meets the state's legitimate interest in the elimination of economic abuses in the industry which are harmful to Ohio citizens, *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); and in the maximization of financial return to an industry within the state, *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

These are legitimate and substantial interests of the State of Ohio, and I find that the Act on its face is drawn carefully to meet them.

On the theory that one who can see what he is buying is more likely to buy wisely, and by virtue of the risk-shifting effects of the Act, the Act is designed to maximize the financial return to an industry within the state, recognized in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) as a legitimate state interest.

Taking the theory one step further, as was observed above in Part II, the Act is designed to lower or at least slow the rise of ticket prices. Evidence introduced at trial suggests that the financial squeeze occasioned by the prohibited practices drove theater owners to raise ticket prices in recent years. By eliminating these practices, the Act is designed to discourage this trend and thereby serve the interests of the Ohio consumers of plaintiffs' product in Ohio.

In addition, the Act permits exhibitors to determine whether a particular motion picture is suited for the audiences that frequent their theaters. By avoiding films an exhibitor may believe will offend the sensibilities of his patrons and by enabling him to bring films to his theater that will yield the best return in a particular community, an exhibitor may maximize his financial return and enhance his goodwill.

Furthermore, the Act serves the First Amendment objective of promoting a wide dissemination of information. *See Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). It

does this by putting the plaintiffs on a more equitable footing with independent distributors, who rarely blind bid or advance license their films. Without their screens booked months in advance, theater owners are more likely to consider showing the readily available films marketed by independents.

Finally the open-bidding procedures contribute to fair and open dealing and remove the suspicion that existed in the industry that bids were not being fairly awarded by removing the opportunity for what is described below as "five o'clock look" deals.

By far the most important purpose for which the statute appears to have been designed and its primary impact on the motion picture industry in Ohio is to effect a better balance of bargaining power between exhibitors and producer-distributors by the prohibition of risk-shifting devices, (e. g., blind bidding, guarantees), by disclosure of licensing procedures, and by facilitating the exercise of exhibitors' informed business judgment. This conclusion is based on the following findings.

### A. Effect of Prior Industry Practices on Ohio Exhibitors

Prior to the enactment of the Act, the evolving licensing practices of the plaintiffs clearly worked to the exhibitors' disadvantage. As the number of new releases steadily declined, the exhibitors found competition among themselves for first-run new releases increasingly fierce.

From the perspective of the theater owner, obtaining a license for the occasional blockbuster became increasingly difficult. In the licensing procedure evolved by the industry, the plaintiffs called virtually all the shots.

When a distributor planned a new release, it would notify exhibitors of the film's availability, set forth the terms it expected to get from exhibitors, and pass along descriptive information about the upcoming film closely resembling the kind of promotion used to "sell" the film to the public generally. On the basis of this infor-

mation, which, as found above, was usually scant and sometimes misleading, the exhibitor "gambled" in submitting bids. Even bidding the distributor's suggested terms did not ensure that one's bid would be accepted; if another theater submitted a bid with a larger guarantee, for example, it was likely to receive the license. Several of the plaintiff companies used "closed bidding"—opening bids privately, so that exhibitors who lost the bid were not aware of the bids submitted by their competitors, and could not determine how to change their bids so as to be more likely winners the next time.

Suspicions about how the winning bids were chosen were aroused among exhibitors. Witnesses spoke at trial about a phenomenon referred to as the "five o'clock look"; however, testimony was not consistent as to its makeup. It was variously described as a situation in which the distributor, after bidding closed at the end of the day, but before bids were examined, would phone an exhibitor to whom he wanted to award the movie and state, for example, "The highest bid I have is $65,000, if you can beat that, it's yours," or as a situation in which the bids were disregarded and a distributor would strike a deal privately with a large exhibitor to award him licenses for all of the theaters in his chain. No concrete evidence was adduced at trial that such abuses actually occurred; however, the Court finds that suspicion ran rampant among Ohio exhibitors.

Once a theater owner was awarded a license, the gamble was far from over. Under blind bidding, an exhibitor booked his screen months in advance and paid substantial sums in guarantees with great uncertainty about the future commercial success of the movie. He could not compare the product he "bought" with that of other companies scheduled for release at or near the same time. A film's plot, emphasis or entire theme might be altered between the time that it was described to him for licensing purposes and the time it arrived at his theater for showing. He had booked his theater months in advance, foreclosing any possibility of licensing readily available films from the small independents.

If the film which he had licensed was not available on the scheduled release date, the exhibitor might find another one substituted in its place; or, he might find the license cancelled at the last minute, with no option for a substitution at all, or with an available substitute for which he must bid without being accorded preference over his competitors.[10]

Even if the film arrived as scheduled under the license agreement, an exhibitor often did not see it until shortly before its public showing. By that time if the exhibitor desired to reject the film on grounds, for example, of poor taste or poor quality, it was often too late to obtain a replacement.

These occurrences occasionally caused exhibitors grave problems with their regular patrons. Theater owners, familiar with their audiences in particular communities and particular theaters, desire to choose films catering to their audience's tastes. Failure to do so results in loss of goodwill as well as revenues. For example, Paul Grossman testified that after he booked the film "The End" in a predominantly Catholic neighborhood, the church condemned the movie and he had to pull it from the theater after seven days for fear of stirring up the public.

### B. The Risk-Shifting Effect of the Ohio Act

The Ohio Act restores some of the bargaining power Ohio exhibitors lost during

---

**10.** Even when a license agreement was cancelled months in advance of the exhibition date, exhibitors testified that most other first-run films were by that time unavailable, having themselves been advanced licensed. Tr. XV-103; XVI–56–58. Paramount Vice President Frank Mancuso testified that when production delays threatened to postpone release of the motion picture "Going South," Paramount cancelled existing license agreements and speeded up production on another film, "American Hot Wax" to fill that time slot. He acknowledged that the alternative film was not given to exhibitors who had committed their theaters to "Going South"; those exhibitors were compelled to bid competitively with others with no assurances of obtaining the "replacement" film. Tr. IV 139.

the development of the increasingly widespread industry practices of blind bidding, guarantees and closed bidding.[11]

The Act does not remove all risk from Ohio exhibitors. An exhibitor still runs the risk that a picture he thinks is great will prove to be a box office failure. And he still runs the risk that one of his competitors will bid better terms and win the license. However, by permitting Ohio exhibitors to view the films before bidding, it permits the exhibitors to use their own business judgment in determining whether, and on what terms, to bid for a motion picture license. It effectively removes the unfairness inherent in the blind bidding process exhibitors described as "buying a pig in a poke." Tr. XII–44.

The legitimate interest a state has in legislating what are found to be injurious practices in their internal commercial and business affairs has been recognized in *Ferguson v. Skrupa*, 372 U.S. 726, 730–31, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963) and *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 526, 69 S.Ct. 251, 252, 93 L.Ed. 212 (1949).

More recently the Supreme Court has specifically acknowledged the legitimacy of the exercise of state power to protect small businesses from trade practices arising out of a disparity of bargaining power. *See American Motors Sales v. Division of Motor Vehicles*, 592 F.2d 219 (4th Cir. 1979), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979). In *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the Supreme Court upheld against due process challenge a California statute restricting the establishment of new auto franchises within the market areas of existing franchises. The legislation arose out of the "disparity in bargaining power between automobile manufacturers and their dealers," *id.*, at 100, 99 S.Ct. at 407, and its purpose was "to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers." *Id.*, at 101, 99 S.Ct. at 407. The Court found that the legislation promoted fair dealing and protected small businesses by protecting "the equities of existing dealers by prohibiting automobile manufacturers from adding dealerships to the market areas of its existing franchisees where the effect of such intrabrand competition would be injurious to the existing franchisees and to the public interest." *Id.*, at 102 and n.7, 99 S.Ct. at 408 and n.7. The Court held that California "was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices." *Id.*, at 107, 99 S.Ct. at 411.

■ It is clear, therefore, that a state has a legitimate interest in weighting a balance in aid of businesses in a weaker bargaining position and disturbing the status quo arrived at by unchecked market forces when they become destructive of fair dealing.

■ The Ohio Act, as shown above, is designed to accomplish this legitimate end. Having found a rational nexus between the legitimate object and the means chosen to achieve it, this Court cannot "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

11. There has been much argument concerning the "abusive" and "oligopolistic" practices of the plaintiffs. The question whether the uses to which the plaintiffs put their bargaining power before the Act rose to the level of federal or state antitrust violations is not presented to this Court and is not decided by it.

There is no hint in the Act that it was intended to rectify antitrust abuses. Whether the Ohio General Assembly perceived abuses of that magnitude is not in issue here. The Court finds merely that the plaintiffs, as the major producer-distributors of motion pictures, are in a strong market position relative to the smaller and more numerous exhibitors, and that the statute serves to put the Ohio exhibitors on a more equitable footing. It is a fair inference that the legislature perceived a situation in the trade which it considered unfair to Ohio exhibitors and sought, by the Act, to improve their lot.

See Exxon Corporation v. Governor of Maryland, 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978).

Since the states "have power to legislate against what are found to be injurious practices in the internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law," Lincoln Federal Labor Union, supra, 335 U.S. at 536, 69 S.Ct. at 257, plaintiffs' due process claims must fail. The Act rationally relates to a number of legitimate and important state interests. It remains for the Court to determine whether the Act runs afoul of some specific federal constitutional prohibition or valid federal law.

IV. First Amendment Claim

Plaintiffs' first claim is that the Ohio statutes deprive them of certain First Amendment rights of freedom of expression. Their argument runs that since their product, motion pictures, is protected expression, a statute which has a direct and immediate impact on that product must be tested by especially stringent standards.

■ There is no question that motion pictures are a form of expression falling within First Amendment protection.[12] Interstate Circuit v. Dallas, 390 U.S. 676, 682, 88 S.Ct. 1298, 1302, 20 L.Ed.2d 225 (1968); United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260 (1948). Even assuming that the Ohio statutes encroach upon that expression, however, that fact does not end the inquiry.

The Supreme Court has rejected the view that freedom of speech, as protected by the First and Fourteenth Amendments, is an "absolute." Konigsberg v. State Bar of California, 366 U.S. 36, 49, 81 S.Ct. 997, 1006, 6 L.Ed.2d 105 (1961). In that case the Supreme Court discussed the two ways in which "constitutionally protected freedom of speech is narrower than an unlimited license to talk":

On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection.[13] On the other hand, general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved.

Id., at 50–51, 81 S.Ct. at 1006.

■ Government confronts its highest burden when it acts in such a way that is directed at the content of the expression, because "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Department of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

■ The Act is not so drawn. It is trade practice legislation, directed at the motion picture industry as opposed to other industries, not because that industry communicates ideas, but rather because, as plaintiffs readily acknowledge, the market structure of that industry is unique.

The Ohio Act is clearly content-neutral. It is an economic regulation operating on all distributors and exhibitors acting within Ohio regardless of the content or subject

---

12. Since the parties have stipulated that none of the motion pictures produced or distributed by the plaintiffs is obscene, this Court is not concerned with First Amendment theories rooted in the notion of obscenity as "unprotected expression." See, e. g., Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

13. Within this category may lie the obscenity censorship cases; those cases are irrelevant to the issues presented in this case insofar as they deal with content-directed regulation which calls for a stricter scrutiny. They are pertinent only to the extent that they indicate that motion pictures are protected forms of expression and that this protection is never absolute. See, e. g., Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

matter of the films involved. To the extent that it affects expression, it does so only incidentally.

As such the Act falls within that category of "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise," which should be upheld when "justified by subordinating valid governmental interests." *Konigsberg, supra*, 366 U.S. at 50–51, 81 S.Ct. at 1007.

Determination of the constitutionality of such legislation necessarily entails a balancing of the legitimate governmental interests it serves against its impact on the protected expression.

In *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), *rehearing denied*, 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188, the court elaborated on the balancing test:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Compare First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786 n.23, 98 S.Ct. 1407, 1421 n.23, 55 L.Ed.2d 707 (1978); *Linmark Associates, Inc. v. Willingsboro*, 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977); *Young v. American Mini-Theatres*, 427 U.S. 50, 78–80, 96 S.Ct. 2440, 2456–57, 49 L.Ed.2d 310 (1976), (Powell, J., concurring); and *Buckley v. Valeo*, 424 U.S. 1, 16, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1975).

First, we must consider what impact the Ohio statutes may have an expression. No impact whatsoever appears from the text of the statute. As applied, the record indicates that the statute has not prevented any motion picture from being exhibited and no one has thus far been penalized by its operation. Plaintiffs claim that it has encroached upon First Amendment freedoms in several ways. They claim it has and will create risks of delay, foreclosure from access to the public, and risks of reduction in the quantity and quality of motion picture productions.

### A. Delay

Plaintiffs claim that the right that is infringed is the "right to have a motion picture exhibited at the optimal time and in the optimal theater." But this is to state their rights too broadly. As noted above, their rights are not absolute; indeed, the Supreme Court, in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952), recognized that "[i]t does not follow [from the principle that motion pictures are within the guarantees of the First and Fourteenth Amendments] that the Constitution requires absolute freedom to exhibit every motion picture of any kind at all times and all places." *See also Young v. American Mini-Theatres, supra*.

Nonetheless, a delay of expression is an abridgement of it; where the delay is not justified by a substantial governmental interest it cannot be condoned. The Court has found above that the trade screening requirement and the statutory bidding process may, in certain limited circumstances, delay the release of a film in Ohio. Although little delay was demonstrated at trial, the risk of delay is posed by the Act. The risk is not great, would affect a rare few of the films distributed, and is unlikely to exceed four weeks. Some risk of delay nonetheless exists.

### B. Foreclosure of Access

There is no evidence that the Act will work to foreclose, altogether, the exhibition of plaintiffs' motion pictures. It neither limits the number of theaters available to distributors in Ohio nor the number of theaters which may exhibit a particular film. In fact, it may open up access to theaters for smaller distributors who formerly could not reach the public in a timely fashion because screens were booked months in advance.

Plaintiffs' foreclosure argument rests on a series of inferences that also underlies their third claim; both arguments will be treated together below.

## C. *Reduction in Quantity, Quality and Diversity of Films*

The last type of deprivation claimed by the plaintiffs is that the statute will restrain the creation of motion pictures, especially controversial films, because it will increase costs of doing business and have a "chilling effect" on the sources of financial support. The result is alleged to be a serious threat to the quantity, quality and diversity of films.

The evidence does not support the claim.[14] Until 1979 the number of motion pictures had been steadily decreasing for decades. This was a result of purposive action within plaintiffs' control in response, in part, to competition for viewers by television. The quality of films has concomitantly improved, as producers attempt to retain a place in the film market for theater productions. The plaintiffs theorize that the fewer films produced, the more risky the undertaking, because less diversity deprives investors of offsets of unsuccessful against profitable films. Part of this risk was shifted to exhibitors by the practices of blind bidding, guarantees, and advances. Guarantees, in particular, have been used by some of the plaintiffs to hedge against a high risk.

Abolition of guarantees means the production occurs without prompt reimbursement; costs are not recovered, if at all, until after the film is completed and the producer's share of box office receipts is delivered by exhibitors. Plaintiffs' theory is that because of the high risk and the cost of production without guarantee front money, the investment is unattractive and investors will channel their funds elsewhere. Because investors will also seek to secure their investments by investing only in the conventional, commercial, sure-hit, and by avoiding the controversial long-shot, plaintiffs maintain that foreign-made films, or films by unknown filmmakers, or films that otherwise carry limited appeal or unpopular ideas will fall by the wayside.

Plaintiffs have not persuaded the Court that this unhappy state of affairs has been or will be wrought by the Ohio Act. Few of plaintiffs' witnesses discussed the impact of the Act on financing and those who did made it clear that the decision to finance and produce a particular film is not primarily motivated by considerations regarding its marketing, such as whether it should be blind bid or trade screened. For example, Gareth Wigan, production vice president for Twentieth Century-Fox, stated, "I am aware that during the last four years there has not been a film that the decision of whether or not to go ahead in production was in any way dependent on whether or not guarantees could be assured." Tr. VI–117. And Alan Hirschfield, referring to the period from 1973 to 1978, when he was president and chief executive officer of Columbia Pictures, testified that investors relied on Columbia's production and marketing expertise and did not consider what licensing and bidding procedures Columbia used. Tr. III–111.

---

**14.** In fact, the opposite may be true. To the extent that plaintiffs' former practices affect the diversity of motion pictures at all, the evidence supports the inference that they may discourage production and distribution of controversial films or of low-budget films with unknown artists. Of this opinion was Max E. Youngstein of Max E. Youngstein Enterprises, Inc. who gave the following illustration in discussing the academy award-winning movie "Marty," distributed by United Artists in 1955:

> . . . I don't think that under today's conditions of blind bidding that a picture like "Marty," which costs approximately $350,-000 to make and had no stars in it, could ever be made.

> . . . if you blind bid, by its very term, you don't get a chance to look at the picture. You don't know what the quality is. I mean, anyone looking at the basic ingredients only ha[s] a story about a fat butcher from the Bronx played by Ernie Borgnine who had never played a leading role in his life. [It] isn't exactly the most attractive package. It becomes attractive after you have seen the picture.

Tr. XVII–115-16.

The steady decrease in the number of films produced has been prompted by market conditions. Thus whereas the yearly new releases averaged around 450 during the 1940's, the plaintiffs and other producer-distributors released 108 in 1977 (of which 17 were reissues) and 102 in 1978. Assuming plaintiffs have increased their financial risks they have done so unilaterally and prior to the enactment of the Ohio Act by reducing the number of films they produce. The Act is not the cause of any such increase in risk.

Thus I find that the only impact of the Act implicating the First Amendment is the risk of an occasional and minor delay in the release of a new film.

Balanced against this are the substantial legitimate governmental interests served by the Act discussed in Part III above: the State's interest in readjusting the relative market strengths of exhibitors and distributors; in establishing fair and open bidding practices; protecting consumers from a rise in ticket prices; removing the opportunities for unfair dealing and as a result, inhibiting suspicion within the industry; and permitting Ohio exhibitors to exercise their independent business judgments in licensing films.

I believe that the incidental restriction on expression is outweighed by the state's in-terests. It is furthermore no greater than is essential to the furtherance of those interests. To the extent its cause derives from the Act at all, the delay is a direct result of trade screening, the importance of which to the state's regulatory purposes has been earlier emphasized.[15] I therefore hold that the Act does not violate the First Amendment to the United States Constitution.

### V. *Commerce Clause*

■ Under federal decisions, the Commerce Clause places some limits on state regulation even in the absence of congressional legislation. *Cooley v. Board of Wardens of the Port of Philadelphia*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). Plaintiffs claim it does so here in three ways.[16]

First, plaintiffs contend that the Ohio Act is invalid as an attempt to regulate interstate commerce so as to deprive it of national uniformity. In addition, they allege that the Act discriminates against, and that it is an undue burden on, interstate commerce. These arguments will be addressed in turn.

### A. *National Uniformity*

■ Under the *Cooley* doctrine, "in the absence of conflicting legislation by Con-

---

**15.** See also the discussion below, Part V. D. relating to delay in the context of lesser restrictive alternatives under the Commerce Clause.

**16.** Plaintiffs attempt to strengthen their Commerce Clause claims by stressing the nature of their product as subject to First Amendment and copyright protection and to establish a hierarchy of items in commerce in which First Amendment protected material has a prominent place. Accordingly, plaintiffs argue that this Court should apply "a far more exacting level of scrutiny" under the Commerce Clause because "the item of commerce at stake is expression protected by the First Amendment." Plaintiffs' Reply Brief at 7; plaintiffs' Post-Trial Brief at 34. While some authority for distinguishing between the types of products in commerce may be found in cases in which the Supreme Court has relaxed its Commerce Clause doctrine for regulation of objects which it found to be "not legitimate subjects of trade and commerce," *Bowman v. Chicago & Northwestern R. Co.*, 125 U.S. 465, 489, 8 S.Ct. 689, 700, 31 L.Ed. 700 (1888); *see Philadelphia v.*

*New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); and certainly the type of product subject to regulation must normally be considered in assessing the impact of a regulation on its flow in commerce, the Supreme Court has avoided drawing doctrinal lines on the basis of the nature of the product regulated. *See Philadelphia v. New Jersey, supra*, 437 U.S. at 622, 98 S.Ct. at 2535. In *Breard v. Alexandria*, 341 U.S. 622, 637, 71 S.Ct. 920, 930, 95 L.Ed. 1233 (1951), the Court specifically rejected the argument now urged by plaintiffs when it remarked as follows in connection with the effect of a "Green River" ordinance on magazine sales:

We recognize the importance to publishers of our many periodicals of the house-to-house method of selling by solicitation. As a matter of constitutional law, however, *they in their business operations are in no different position so far as the Commerce Clause is concerned* than the sellers of other wares. (Emphasis supplied.)

gress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). However, the states do not have authority "to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Id.* at 767, 65 S.Ct. at 1519; *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824).

Plaintiffs claim that since the motion picture industry is national in scope, its business and its product are of such a nature that they are not amenable to local regulation and that their regulation, if any, must be prescribed by a single authority. *See Milk Control Board v. Eisenberg Farm Products Co.*, 306 U.S. 346, 351, 59 S.Ct. 528, 530, 83 L.Ed. 752 (1939).

They claim that the enactment of different anti-blind bidding statutes by the several states enmeshes the industry "in a welter of varying or conflicting state regulations which will virtually destroy" the plaintiffs' ability to operate efficiently and effectively on a national basis."[17] Plaintiffs contend that the enforcement of this Act and others like it will prevent simultaneous national release of films or at least postpone such releases until the distributor has complied with the most onerous statute. See *National Bellass Hess, Inc. v. Dept. of Revenue*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967).

This latter claim, while spawning interesting speculation, was not borne out at trial. The Court recognizes that in order "to appraise the weight of the burden of the . . . statute on interstate com-

merce, related statutes of other states are important to show whether there are cumulative effects which may make local regulation impracticable." *Morgan v. Virginia*, 328 U.S. 373, 381–82, 66 S.Ct. 1050, 1056, 90 L.Ed. 1317 (1946). Nonetheless, I am not here presented with the question of the constitutionality of those other statutes. I have reviewed the other laws and find them quite similar. ·

The Commerce Clause has been invoked against state legislation that so conflicts with laws of other states that it effectively impedes the flow of interstate commerce. Thus, in *Southern Pacific, supra*, where the Arizona Train Limit Law outlawed trains consisting of more than a stated number of cars, the law effectively required standard length trains passing through Arizona to stop at the border and be broken up and reassembled. It directly conflicted with standard practice in neighboring states. The same is true of the Illinois law struck down in *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) which required interstate motor carriers to be equipped with a contour mudguard that was unlawful in Arkansas. Therefore a carrier traveling from Arkansas into Illinois had to weld such a mudguard to the trailer body or unload and transfer cargo, necessitating a two-to-four hour delay at the Illinois border.

The problem here, however, is similar to that perceived by the Supreme Court in *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), wherein the appellants pointed out "that many state legislatures have either enacted or considered proposals similar to Maryland's and that the cumulative effect of this sort of legislation may have serious implications for their national marketing operations." Acknowledging the significance of this concern, the Court none-

---

**17.** As of the time of trial, 14 states in addition to Ohio had enacted anti-blind bidding statutes. The states adopting similar provisions up to the time of trial are: Alabama, South Carolina, Louisiana, Virginia, Georgia, Tennessee, West Virginia, New Mexico, Utah, Idaho, North Carolina, Washington, Maine and Oregon.

Aside from variations in enforcement provisions, the enactments are quite similar, in every case prohibiting blind bidding, requiring trade screening, and regulating bidding procedures.

theless rejected a Commerce Clause attack, declaring:

> The evil that appellants perceive in this litigation is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted. The problem thus is not one of national uniformity. In the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening of interstate commerce, we cannot conclude that the States are without power to regulate in this area.

*Exxon Corporation*, 437 U.S. at 128–29, 98 S.Ct. at 2215. *Cf. Huron Cement Co. v. Detroit*, 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960).

In the case before the Court, there has been some testimony relating to inconvenience the Act causes plaintiffs in communities spanning state lines. Thus, for example, marketing in the Cincinnati, Ohio/Covington, Kentucky area is complicated by the absence of a similar law in Kentucky. These variations in the law, however, do not obstruct or block the flow of films at Ohio's borders as did the train-length regulation in *Southern Pacific, supra.*

Although plaintiffs' counsel spoke in terms of a "crazy quilt patchwork" of conflicting regulations, their witnesses' testimony belied the assertion that the statutes of the 15 states which have enacted such legislation are in conflict with each other and with laws of other states. Frank Mancuso, head of distribution at Paramount, admitted on direct examination that the 15 statutes were "basically similar in their problem aspect," that is that they all "basically prohibit blind bidding." Beyond that, the only objection Mancuso had to multi-state regulation was that it required Paramount to "keep documentation as to what you can and cannot do as the provisions would provide for." Tr. IV–72.

Interoffice instructions to different Twentieth Century-Fox branch offices on how to comply with various anti-blind bidding laws were practically identical, word-for-word. Tr. II–109–13; defendant's Exhibits YY, ZZ, AAA, BBB, CCC. Similarly, the wording and substantive provisions of instructions to different Universal branch offices are remarkably similar. Tr. VII–152–60; defendant's Exhibits WWW, SSS, XXX, DDD and IIII.

When asked, "So the worst possible situation for you would be if all states had this anti-blind bidding legislation, would it not?" David Weitzner, vice president of advertising for Twentieth Century-Fox responded, "The worst situation would be if all states had this, yes." Tr. V–151.

The Supreme Court has stated in *Exxon Corporation* that only "rarely" does the Commerce Clause preempt an entire field from state regulation, "and then only when a lack of national uniformity would impede the flow of interstate goods." 437 U.S. 128, 98 S.Ct. at 2215. It is clear from *Exxon Corporation* that it is not open to plaintiffs to argue that simply because the economic market for motion pictures is nationwide, no state has the power to regulate that market. Absent evidence that the enactment of anti-blind bidding regulations in several states acts to impede the flow of interstate commerce, this Court cannot find that it impermissibly encroaches on the Commerce Clause.

### B. *Discrimination Against Interstate Commerce*

The statute favors exhibitors in Ohio and disadvantages producer-distributors, the vast majority of whom are created by the laws of other states, have their principal places of business outside Ohio and operate in interstate commerce. Clearly, each of the plaintiffs fits this description. However, this does not establish that the Act discriminates against interstate commerce. An independent producer-distributor located in Ohio—if such existed—would be subject to its terms. The absence of such an entity does not render the Act constitutionally infirm. As the Supreme Court noted with respect to a similar argument in *Exxon Corporation* :

> Since Maryland's entire gasoline supply flows in interstate commerce and since

there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meaningless.

*Exxon Corporation, supra,* 437 U.S. at 125, 98 S.Ct. at 2213. The Ohio Act neither creates a barrier against interstate commerce, prohibits the flow of interstate goods, places added costs upon them, nor distinguishes between in-state and out-of-state companies. *Id.* at 126, 98 S.Ct. at 2214. Accordingly, I find that the Act does not discriminate against interstate commerce. *See, e. g., id.; Hunt v. Washington Apple Advertising Comm'n.,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

## C. *Undue Burden*

 Lastly, plaintiffs complain that the Act constitutes an impermissible burden on interstate commerce. The Supreme Court made it clear in *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) that even in the absence of some element of discrimination against interstate commerce the asserted purposes of the enactment must be balanced against the interference it works on interstate commerce. *See Bibb v. Navajo Freight Lines,* 359 U.S. 520, 529, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959). A regulation which affects interstate commerce will be impermissible if its effect is unduly burdensome. *See Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976).

The rule has been well-established since the Supreme Court decided *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows:

Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443 [, 80 S.Ct. 813, 815, 4 L.Ed.2d 852] (1960). If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Accord, Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664 (1977); *Great Atlantic & Pacific Tea Co. v. Cottrell, supra,* 424 U.S. at 371–72, 96 S.Ct. at 927–28. This process entails a "delicate adjustment" giving "sensitive consideration to the weight and nature of the state regulatory concern in light of the extent of the burden imposed in the course of interstate commerce." In *Raymond Motor,* for example, the Court concluded that a Wisconsin regulatory statute banning vehicles over 55 feet long from the state highways violated the Commerce Clause because it placed a substantial burden on interstate commerce without making more than a speculative contribution to welfare of the state in terms of highway safety.

The benefits purported to be served by the Act have been discussed above in Part III. The question presently before the Court is whether it imposes burdens that are clearly excessive in relation to those benefits. I hold that it does not.

The burdens plaintiffs allege the Act imposes on interstate commerce are delays in the release of motion pictures, interference with plaintiffs' ability to license with the most desirable theaters, and interference with the interstate marketing of motion pictures.

The only burden on interstate commerce that plaintiffs have demonstrated is a delay of the release of films in Ohio in certain instances, which the Court found above. To reiterate, the instances of delay caused by the Ohio Act are limited to that narrow

category of films intended for national release which are not completed according to schedule. In those instances, the flow of motion pictures out of production and into Ohio theaters will theoretically be interrupted and delayed for the two to four weeks it takes for the trade screening and bidding to occur.

The other claims which plaintiffs allege to be unconstitutional burdens fail either because they simply were not proven to exist or they do not amount to burdens on interstate commerce.

Thus, I find the Act poses no threat of foreclosing any of the plaintiffs from entering the Ohio market. Plaintiffs complain, however, that the Act will foreclose their access to the most desirable theaters at the optimum times.

I find that plaintiffs have failed to prove this allegation as a matter of fact. If the Act were applicable to only some distributors of motion pictures, permitting others to continue to advance license, then certainly it would have the effect of giving the advance licensors greater opportunity to book the best theaters and correspondingly would diminish that opportunity for those subject to the Act.

But the Act does not distinguish between groups of distributors. It treats all distributors alike, putting them on equal footing with one another. Rather than foreclosing access to theaters, it holds all theaters open until a film is completed and has been trade screened for all exhibitors. The Act does not close any theaters to plaintiffs' films; it only opens the eyes of theater owners. To the extent that the Act, by permitting theater owners to judge competing films on the basis of their own notions of quality, makes available a first-run theater to a distributor who is not one of the plaintiffs in this action, it may effect a foreclosure of the plaintiffs from that particular theater. Such an occurrence is not mandated by the Act, however, but would be the result of freely operating market forces.

The Act clearly does interfere with the business practices plaintiffs have in the past chosen to utilize for the interstate marketing and distribution of their product. Thus, the Act does deprive the plaintiffs of the opportunity to demand guarantees whenever they want to and by requiring minor, changes in bidding mechanics, it may minimally increase their costs of distribution.

There was no evidence that the plaintiffs' cost of licensing would be substantially increased, though there was evidence that the money spent promoting films may be less economically spent because of a potential decrease in use of national network TV advertising resulting from the Act.

However, to say that the Act affects or burdens the plaintiffs is not necessarily the same as saying the Act also burdens interstate commerce. In spite of certain "burdens" the Act imposes on the plaintiffs, the Court is convinced that they are not the sort of regulation about which the Commerce Clause is concerned.

■ The Commerce Clause doctrine is aimed at legislation which sets up trade barriers blocking or burdening the free flow of commerce between the states. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 807, 96 S.Ct. 2488, 2496, 49 L.Ed.2d 220 (1976). In that case, the Court upheld a Maryland statute, which, by providing a monetary "bounty" for vehicle hulks processed in the state, actually reduced the flow of such hulks in interstate commerce, that is, out of the state of Maryland. *Id.* at 804, 806, 96 S.Ct. at 2495, 2496. The shift of business from one entity to another does not burden interstate commerce so long as the flow of commerce between the states is not substantially affected. *Exxon Corporation v. Governor of Maryland*, 437 U.S. at 127, 98 S.Ct. at 2214.

The Ohio Act does not block or impede the flow of commerce between the states. Thus, for example, the Act has no effect whatsoever on commerce passing through Ohio destined for another state. Nor does it prevent any distributor from entering the Ohio market. On the contrary, by facilitating competition among film producers on the basis of the quality of their product and by removing some of the competitive ad-

vantages the plaintiffs formerly had over their smaller competitors, the Act may promote the entry of independent distributors into the Ohio market.

There may be cases of mere regulation which so interferes with long-standing trade practices that it amounts to an unconstitutional burden on the interstate industry. However, this is not such a case.

As noted above, the Court has been unable to identify any federal right entitling plaintiffs to the best theaters at the best times. Their concern with placement of films in particular theaters and their desire to maintain existing marketing practices, are reduced to a predilection for certain business practices developed by the industry in recent years. Addressing similar contentions in *Exxon Corporation, supra*, at 127, 98 S.Ct. at 2215, the Supreme Court rejected the "notion that the Commerce Clause protects the particular structure or methods of operation in a retail market." In that case, the Supreme Court acknowledged the possibility that the statute there challenged might cause some interstate companies to withdraw from the Maryland market altogether. And in *Breard v. Alexandria*, 341 U.S. 622, 639, 71 S.Ct. 920, 931, 95 L.Ed. 1233 (1951) the Supreme Court upheld a "Green River" ordinance (prohibiting door-to-door solicitation absent permission by homeowners) notwithstanding that it would "compel the development of a new technique of approach to prospects."

The Supreme Court's pronouncement in *Exxon* is applicable here: "[T]he [Commerce] clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corporation*, 437 U.S. at 127–28, 98 S.Ct. at 2215. The "burdens" which the plaintiffs assume under the Act are simply not burdens on the interstate market. To the extent that interstate commerce is affected at all, with the exception of the delay discussed above, it is not asked to bear any burdens.

D. *Less Restrictive Alternatives*

Plaintiffs, particularly in their post-trial brief, stress the existence of less restrictive alternatives to the statutory provisions for effectuating the purposes of the Act.

The Supreme Court has made it abundantly clear that when proceeding under the Commerce Clause, in determining whether a regulation either discriminates against or unduly burdens interstate commerce, a two-step analysis should be used. First, a burden or discrimination must be proved. If such an effect on commerce is first found, then the Court must balance it against the state benefits sought to be effectuated by the regulation. It is in the second step, as part of the balancing process, that the least restrictive alternative analysis comes into play.

Thus in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), in discussing the question whether a nondiscriminatory regulation unduly burdens interstate commerce, the Supreme Court first concluded, "[t]hus it is clear that the appellant's order does affect and burden interstate commerce, and the question becomes whether it does so unconstitutionally." *Id.* at 142, 90 S.Ct. at 847. The Court then articulated the balancing process quoted above, stating, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* at 142, 90 S.Ct. at 847.

Similarly, in *Hunt v. Washington Apple Advertising Comm'n.*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977), the Court, analyzing regulation under the doctrine concerning discrimination against interstate commerce, made it clear that discrimination must first be found before lesser restrictive alternatives need be sought. Having found that the North Carolina statute discriminated against interstate commerce in several ways, the Court concluded:

> When discrimination against commerce of the type we have found is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailabili-

ty of nondiscriminatory alternatives adequate to preserve the local interests at stake.

*Id.* at 353, 97 S.Ct. at 2446 (citations omitted).

■■■ The Court has found the Act does not discriminate against interstate commerce. It has also found that the Act burdens interstate commerce in one way only: by occasionally delaying the exhibition of certain films into Ohio.

The question now before the Court is whether the burden of delay imposed by the Act is excessive in relation to the putative local benefits it confers. In examining this question, the relative nature of the burden and the local interest are weighed and the issue whether the local interest can be promoted by a lesser impact on interstate activities must be determined.

The potential delay referred to has been found to be a relatively minor, relatively infrequent occurrence. As was discussed in connection with the First Amendment, to the extent that such a delay is caused by the Act, it is a result of the Act's anti-blind bidding and trade screening requirements, because it is they which require the postponement of bidding until after a completion of production. The necessity of trade screening to an intelligent exercise of a licensee's judgment has been found by the Court above. The Court has rejected the notion that a film short of completion can be used for this purpose. The existing sources of information available to an exhibitor have been found to be inadequate. The plaintiffs have extensive control over the length of the delay in a particular instance. I do not believe there are less restrictive alternatives to trade screening that would as effectively achieve the informed decision-making sought to be fostered by the Act. Accordingly, I find that the burden of delay is slight in relation to the state's stated objective to establish a framework for the exercise of an informed business judgment by Ohio theater owners in selecting films for their theaters. I cannot find that the burdens on interstate commerce occasioned by the Ohio Act are un-

due. Unable to find that the Ohio Act discriminates against or unduly burdens interstate commerce, or that it otherwise works a substantial detriment to the constitutional scheme of free commerce among the states, I hold that plaintiffs' Commerce Clause claims must fail.

## VI. *Copyright Preemption*

Count IV of the complaint alleges that the Act, on its face and in its application, will deprive plaintiffs of their rights under the Federal Copyright Act, 17 U.S.C. §§ 101, *et seq.*, and is therefore preempted by virtue of 17 U.S.C. § 301, the general grant of copyright in Article I, § 8 of the United States Constitution, and the Supremacy Clause of Article VI of the United States Constitution.

■■■ In examining this argument and the one regarding antitrust to follow, the Court has borne in mind certain basic principles of the law of preemption gleaned from Supreme Court opinions. In determining whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause the Court must employ "a two-step process of first ascertaining the construction of the two statutes and then determining whether they are in conflict." *Perez v. Campbell,* 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971).

In *Perez* the Supreme Court recently restated the governing principle enunciated by Chief Justice Marshall in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824): " '[A]cts of the State Legislatures . . . [which] *interfere with,* or are contrary to the laws of Congress, made in pursuance of the Constitution, are invalid under the Supremacy Clause.' " *Perez, supra,* 402 U.S. at 649, 91 S.Ct. at 1711. More recently, the Supreme Court has adhered to the principle as articulated by Mr. Justice Black, that in the final analysis, the Court's function is to determine whether the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399,

404, 85 L.Ed. 581 (1941). *See Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979); *Perez, supra*, 402 U.S. at 649, 91 S.Ct. at 1711. *See also Kewanee Oil Co. v. Bicron Oil Corp.*, 416 U.S. 470, 479, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141, 83 S.Ct. 1210, 1216–17, 10 L.Ed.2d 248 (1963). Because preemption raises sensitive issues of state/federal relations, preemption analysis must proceed on "the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted." *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973).

■ An inconsistency does not warrant preemption unless it is clear and readily apparent; "[t]o hold otherwise would be to ignore the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation where none clearly exists." *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960).

■ Article I, § 8 of the United States Constitution confers on Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." [18] Pursuant to that grant, Congress has legislated in the area of copyrights. Prior to the Copyright Act of 1976, this legislation pertained only to published or registered works, with a common law copyright available for unpublished works under state law only. *See Wheaton v. Peters*, 33 U.S. (8 Peters) 591, 8 L.Ed. 1055

(1834). In 1977, after years of debate and hearings, Congress substantially revised Title 17 of the United States Code, creating a statutory copyright attaching from the moment of creation and eliminating the dual system of copyrights. It did so by virtue of § 301(a), which provides:

§ 301. "Preemption with respect to other laws."

(a) On and after January 1, 1978, *all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright* as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by Sections 102 and 103, whether created before or after that date and whether published or unpublished, *are governed exclusively by this title.* Thereafter no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state.

The intent of Congress in enacting this provision is set forth in Notes of the Committee on the Judiciary, House Report No. 94–1476, 94th Cong., 2d Sess. (1976), (reprinted at pp. 271–72 of 17 U.S.C.A. (1977)):

Instead of a dual system of "common law copyright" for unpublished works and statutory copyright for published works . . . the bill adopts a single system of Federal statutory copyright from creation. . . . Common law copyright protection for works coming within the scope of the statute would be abrogated.

. . .

The Committee Notes continue:

PREEMPTION OF STATE LAW. The intention of Section 301 is to preempt

---

**18.** While it is clear that "one of the fundamental purposes behind the Copyright Clause of the Constitution, as shown in Madison's comments in *The Federalist*, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various states," H.Rep. No. 94-1476, 94th Cong., 2d Sess., (1976), the Copyright Clause of the Constitution envisages concurrent rather than exclusive federal power. *Goldstein v. California*, 412 U.S. 546, 93 S.Ct.

2303, 37 L.Ed.2d 163 (1973); 1 *Nimmer on Copyright* § 1.01[B] at 1–6. Since that clause does not preempt state legislation in this area, the Court will not consider the claim of preemption by Article I, § 8 further. But Congress in enacting the Copyright Act of 1976, Pub.L. No. 94-553, § 101 *et seq.*, 90 Stat. 2572, effective January 1, 1978, statutorily preempted state copyright laws by creating a single federal system for both published and unpublished works. 1 *Nimmer on Copyright* § 1.01[B] at 1-6.

and abolish any rights under the common law or statutes of a state that are equivalent to copyright and that extend to works coming within the scope of the Federal Copyright Protection. The declaration of this principle in Section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal Protection.

. . . . .

As long as the work fits within one of the general subject matter categories of Section 102 and 103, this bill prevents the states from protecting it even if it fails to receive Federal statutory copyright . ..

Subsection (b) of § 301 represents "in a general way the obverse of subsection (a)," H.R.Rep. No. 2237, 89th Cong., 2d Sess. 128 (1966), and limits the scope of preemption under the former subsection, providing in pertinent part:

Nothing in this title annuls or limits any right or remedies under the common law or statutes of any State with respect to—

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106. 17 U.S.C. § 301(b).

The first question, therefore, is whether the Ohio Act creates, grants or destroys any rights that are "equivalent" to the exclusive rights of copyright set forth in 17 U.S.C. § 106. *See Orth-O-Vision, Inc. v. Home Box Office*, 474 F.Supp. 672 (S.D.N.Y.1979).

The exclusive rights granted by § 106 to the copyright owner are:

(1) to reproduce the copyrighted work . . .;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of . . . motion pictures, and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of . . . works . . including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly. 17 U.S.C. § 106.

 I believe Professor Nimmer states correctly what is a right "within the general scope of copyright" and identified in § 106:

It consists of a right to prohibit reproduction . . ., performance, distribution or display of such a work.

1 *Nimmer On Copyright* § 1.01[B] at 1–11. A state statute creating rights which could be violated by the mere act of reproduction, performance, distribution or display is preempted by the statute. *Id.*

 It is clear to the Court that the Ohio Act does no such thing. It neither creates rights equivalent to those within the scope of the federal act nor deprives copyright owners of the protections afforded by the federal copyright. The Ohio Act does not deprive motion picture copyright owners of their rights to prohibit reproduction, performance, distribution or display of their work; nor does it vest the rights to reproduction, performance, distribution or display in exhibitors or any other person. Indeed, by providing procedures for the licensing of a film, the Act recognizes *sub silentio* the right of the copyright owner to exhibit the motion picture and to grant an exclusive or restrictive license to others to exhibit it. *See Interstate Circuit v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

Plaintiffs, however, do not rest their position entirely on the question of equivalent rights. Rather, they contend that the Ohio Act so restricts the exercise of federally created rights that it otherwise "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The short answer to this contention is that Congress, in drafting § 301, was free to include state laws relating to non-equivalent rights among those laws it chose to preempt, and Congress elected not to do so. Congress carefully and expressly limited preemption to laws governing all rights equivalent to those within the scope of copyright, and excluded from preemption all other legal and equitable rights. Thus Congress intended to leave the states free to propound law in the areas of the common law rights of privacy, publicity, trade secrets, defamation and fraud, each of which affect and restrict the exercise of copyright, so long as the causes of action concerning them contain elements that are different from copyright infringement. H.Rep. No. 94–1476, 94th Cong., 2d Sess. (1976) at 132, U.S.Code Cong. & Admin.News 1976 at 5747.

Notwithstanding that the purpose of § 301 is to make clear that Congress intended preemption "not extend to causes of action or subject matter outside the scope of the revised Federal copyright statute," id., at 131, U.S.Code Cong. & Admin.News 1976 at 5747, it may not be gainsaid that Title 17 is the supreme law of the land and its policy "may not be set at naught, or its benefits denied," by state law touching upon the area of the federal statutes. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 229, 84 S.Ct. 784, 787, 11 L.Ed.2d 661 (1964).

In other areas of federal concern the principle that the Supremacy Clause prohibits states from placing restrictions on the exercise of federally created rights has preempted state laws. Thus the plaintiffs point out that a state may not, for example, require compulsory arbitration if to do so would infringe on the federally protected right to strike, Amalgamated Street Employees v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364 (1951); and a state rule of procedure cannot constitutionally divest a litigant of a right to jury trial granted by federal statute. See Dice v. Akron, Canton & Youngstown R.R., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952).

Plaintiffs point in particular to a passage from Sperry v. Florida ex rel. Florida Bar Ass'n., 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963) in which the Supreme Court struck down state restrictions on a nonlawyer's right to practice before the Patent Office. Noting that this right was granted by the Commissioner of Patents pursuant to a valid federal statute, the Court held:

[A] State may not enforce licensing requirements which, though valid in the absence of federal regulation . . . impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress. "No State law can hinder or obstruct the free use of a license granted under an act of Congress." (Authorities omitted.)

Id. at 385, 83 S.Ct. at 1326. And plaintiffs invoke the case of Remick Music Corp. v. Interstate Hotel Co., 58 F.Supp. 523 (D.Neb. 1944), aff'd., 157 F.2d 744 (8th Cir. 1946), cert. denied, 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691 (1947) in which Nebraska legislation regulating monopolization of sheet music distribution was struck down as violative, in part, of the former Federal Copyright Act. In Remick, the district court stated:

"While the power reasonably to restrain unlawful monopolistic trade-restraining combinations from exercising any rights in the state may be conceded, an act which compels the owner of a copyright to offer it for sale in a certain way, and if he fails so to do to take it from him without compensation, violates the due process and equal protection clauses of the Constitution [Amendment 14], and it is also violative of the Federal Copyright Act."

Whatever may be professed as its purpose, in support of Section 59–1202, it is actually designed practically to strike down and nullify within the State of Nebraska the right of public performance for profit [granted by the prior Copyright Act].

*Id.* at 543 (quoting from *Buck v. Swanson,* 33 F.Supp. 377, 388 (D.Neb.1939)).[19]

Accordingly, the Court will address plaintiffs' assertions to determine if the Ohio Act is preempted by the Copyright Act of 1976, not because it creates or protects equivalent rights in violation of 17 U.S.C. § 301(a), but because it somehow otherwise interferes with the protections intended to be accorded by the federal law.

Since the Court's task in applying Supremacy Clause scrutiny is "to determine whether, under the circumstances of this particular case, [the State's] law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' . . . This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Company,* 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977) (citations omitted).

Therefore, the Court must consider the ways in which, according to plaintiffs, the Ohio Act undercuts the rights granted by copyright.

First, plaintiffs assert that the Ohio Act's prohibition of licenses conditioned on guarantees conflicts with the right afforded the copyright owner "to distribute copies . . . by rental, lease, or lending." Plaintiffs contend that as a result of this prohibition, the owner of the copyright in a motion picture is faced with the mutually exclusive choices of licensing his film for a fixed price (guarantee) and licensing his film only for a participation in its profits (film rental). Plaintiffs contend that the Ohio Act operates to deny to an artist one of the most basic rights inhering in private property— the right to sell or lease the property for a fixed price reflecting its value to the lessee.

As a factual matter, the Act does not present the plaintiffs with the Hobson's Choice indicated. By its terms, it does not prohibit guarantees; it merely prohibits *conditioning* the granting of a license agreement on the payment of a guarantee when a film rental is also sought. The Act merely limits the circumstances under which guarantees may be obtained to situations in which the licensor does not compel the licensee to promise a guarantee as a condition to receiving the license. Yet in so doing, the Act does restrict the formerly unfettered discretion in producer-distributors to demand payment by guarantees.

Second, plaintiffs claim that the prohibition of negotiation subsequent to an unsuccessful bidding will tend to diminish copyright owners' ability to license their creations on the best available terms, because exhibitors hearing of their competitors' bids and aware of the time running against the set release date will have little incentive to raise bids.

Third, plaintiffs complain that the Act's blind bidding prohibition, § 1333.06(A), and its uniform notice and bidding requirements, §§ 1333.07(C) and (F), interfere with plaintiffs' objectives to perform their motion pictures under optimum circumstances.

Lastly,[20] plaintiffs contend the Act's trade screening requirement interferes with their rights of performance by compelling them to perform their product in front of a

---

**19.** The two cases relied on by the plaintiffs are clearly distinguishable from the instant case. *Sperry v. Florida, supra,* it should be noted, is concerned not with patent rights, which are in legal effect analogous to copyrights, but with a federally-endowed license to practice patent law under certain circumstances. It does not stand for a proposition that no state may regulate the sale or licensing of patented articles in commerce. In *Remick Music Corp. v. Interstate Hotel Co., supra,* the court was clearly concerned with the absolute forfeiture of the federally protected right worked by the state statute for the failure to abide by the conditions it imposed on the exercise of that right.

**20.** The Court has rejected above the chain of inferences advanced by the plaintiffs intended to yield the conclusion that the guarantee prohibition will discourage investment and ultimately reduce artistic endeavor. Even if such a finding could be made, the legal conclusion the plaintiffs would have the Court draw therefrom is defeated by the rule discussed *infra* that "[t]he copyright law, like the patent statutes, make reward to the owner a secondary consideration." *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 156-57, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948).

group of people as a condition to licensing it in Ohio.

The first three contentions proceed from the erroneous premises that the copyright confers on its owner the right to dispose of its subject matter on the optimum terms and that the fundamental purpose of the copyright laws is to reward the owner. Given these premises, plaintiffs arrive at the conclusion that interference with the copyright owner's right to optimum terms so frustrates the objectives of the federal law that preemption is warranted.

 The fundamental purpose of the constitutional grant of copyright is enunciated in Article I, § 8 as "to promote the progress of Sciences and useful Arts." The rationale was explained by the Supreme Court as based on "the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors . . . ." *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). "The copyright law, like the patent statutes, make reward to the owner a secondary consideration." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948). Accordingly, the primary purpose of copyright is *not* to reward the author, but is rather to secure "the general benefits derived by the public from the labors of authors." *Fox Film v. Doyal*, 286 U.S. 123, 128, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932); *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975).

The Supreme Court has long recognized the distinction between the rights composing copyright and the property produced and marketed by virtue of the copyright.

Copyright is a right exercised by the owner during the term at his pleasure and exclusively for his own profit and forms the basis for extensive and profitable business enterprises. *The advantage to the public is gained merely by the carrying out of the general policy in making such grants* and not from any direct interest the Government has in the use of the property which is the subject of the grants. After the copyright has been granted the Government has no interest in any action under it save the general one that its laws shall be obeyed.

*Fox Film v. Doyal, supra*, 286 U.S. at 130, 52 S.Ct. at 548. The Supreme Court has rejected the notion that because "a copyright is property derived from a grant by the United States," it is not subject to state regulation of the manner in which its product is marketed. *Fox Film Corp. v. Doyal*, 286 U.S. 123, 128, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932). Further, the Supreme Court has rejected claims that the exclusive right granted by Congress to distribute copyrighted material included the exclusive right to distribute it in the manner deemed most desirable by the copyright holder. *Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

In *Fox Film, supra*, the Supreme Court upheld a state's direct taking by imposition of a tax, of royalties derived from federal copyrights. Scarcely a more blatant, effective method of reducing the author's award can be imagined. Yet the Court stated:

The statute confers upon the author after publication the exclusive right for a limited period to multiply and vend copies and to engage in the other activities described by the statute in relation to the subject matter, U.S.C., Tit. 17. In creating this right, the Congress did not reserve to the United States any interest in the production itself, or in the copyright, or in the profits that may be derived from its use. Nor did the Congress provide that the right, or the gains from its exercise, would be free of tax. The owner of the copyright, it he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property. The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.

. . . The nature and purpose of copyrights place them in a distinct category and we are unable to find any basis for the supposition that a nondiscriminatory tax on royalties hampers in the slightest degree the execution of the policy of the copyright statute.

*Fox Film, supra*, 286 U.S. at 127, 131, 52 S.Ct. at 546–548 (citations omitted).

The authority of the states to regulate market practices dealing with copyrighted subject matter is well-established. Thus, for example, the Supreme Court has made it clear that the existence of a copyright does not permit its owner to contract concerning it in ways that suppress competition in violation of federal antitrust laws. 15 U.S.C. § 1, *et seq. Interstate Circuit v. United States*, 306 U.S. 208, 230, 59 S.Ct. 467, 476, 83 L.Ed. 610 (1939). Similarly, ownership of a copyright does not entitle a company to abuse the market power it obtains thereby by engaging in a *per se* illegal tying arrangement, *see, e. g., United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156–57, 68 S.Ct. 915, 928–29, 92 L.Ed. 1260 (1948), price fixing, *see, e. g., Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), or other fraudulent or deceptive practices, *cf. Mariniello v. Shell Oil Co.*, 511 F.2d 853 (3rd Cir. 1975); *Hearing Aid Ass'n of Kentucky, Inc. v. Bullock*, 413 F.Supp. 1032 (E.D.Ky.1976).

The State of Ohio is no more interfering with the legitimate rights of owners of copyrighted motion pictures by regulating the ways in which plaintiffs and other producer-distributors license their product in order to achieve fair and open bargaining than were the states in passing the legislation upheld in those cases.

The plaintiffs' fourth contention—that the trade screening requirement compels a performance within the meaning of the Copyright Act—is a different animal. But it is just as easily disposed of for the reason that the trade screening requirement only affects copyright holders who wish to license their films in Ohio; it does not compel performance in any other circumstances.

The provision does not deprive the plaintiffs of their right to decide whether or not to perform the work publicly. As in *Fox Film, supra*, the plaintiffs are free to choose not to perform their work publicly, and may continue to enjoin others from performing it. Thus they retain complete control over the rights granted by the Copyright Act: to prohibit display, performance, reproduction and distribution. It is only *after* the copyright owner has made the decision to perform the work—to release the motion picture—in Ohio that the Ohio Act steps in and compels a performance before exhibitors as a condition to the distribution of films in Ohio. And this condition is not unfounded. As the Court found above, trade screening is the most effective way for licensees of motion pictures adequately to assess the quality and commercial potential of the films they are licensing. Certainly blind bidding, by depriving the exhibitor of the opportunity to judge the quality of what he is licensing, does nothing to encourage the creative excellence the copyright laws are designed to foster. There is substantial support for the judgment of the state that trade screening is essential to the fair marketing of plaintiffs' films, and there is nothing in the federal Copyright Act prohibiting the state from exercising its police powers to rectify a market situation it perceives as inequitable. The comment by the Supreme Court regarding the practice of blockbooking in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948) is apropos:

It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius. But the reward does not serve its public purpose if it is not related to the quality of the copyright. . . . The [prohibited] practice tends to equalize rather than differentiate the reward for the individual copyrights.

All of the provisions of the statute complained of tend to differentiate the reward for individual copyrights by enabling exhibitors to distinguish between proffered motion pictures. This effect and the anticipa-

ted increased opportunity the Act affords to independents for the showing of their films, far from frustrating the objectives of Congress in enacting the Copyright Act, further the wide dissemination of copyrighted works and thereby its primary object "to advance the public welfare through the talents of authors . . . ." *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954).

Therefore, I hold plaintiffs' claims of preemption under the Federal Copyright Act, U.S.C. Title 17, must fail.

### VII. *Antitrust Preemption*

In Count V of their complaint, plaintiffs charge that the Ohio Act sanctions and mandates certain collusive conduct which is violative of the federal antitrust laws, and is therefore preempted by virtue of the Supremacy Clause of the United States Constitution, Article VI. Specifically, plaintiffs allege that the Act facilitates anticompetitive conduct by Ohio exhibitors in three ways.

First, the Act is alleged to encourage and facilitate "product splitting"—a phenomenon whereby groups of exhibitors agree to allocate available films within a given geographic area, thereby assuring that each exhibitor has some product for exhibition at all times.

Second, plaintiffs assert that the open bidding provisions interfere with independent pricing behavior of individual exhibitors by enabling them to view and compare bid terms offered.

Third, the plaintiffs allege that the provision limiting the use of guarantees reduces competition among exhibitors by dispensing with an important competitive tool.

The Court is not persuaded by these arguments nor can it conclude on any other grounds that the Ohio Act conflicts with federal antitrust policy so as to warrant preemption by it.

Plaintiffs' concern about product splitting fails as a matter of law to support their preemption theory. Product splitting is said to be encouraged by the shorter time periods between licensing and release and the greater uncertainty resulting from last-minute transactions, alleged to follow from the Act's trade screening requirement. Plaintiffs describe the open-bidding requirement of § 1333.07(D) as a statutorily mandated method of policing compliance with a product splitting arrangement. Compliance is assured by viewing bids of exhibitors participating in the split to determine whether they bid as agreed.

■ Assuming, *arguendo*, that in a proper case, product splitting is anticompetitive conduct violative of the Sherman Act, 15 U.S.C. §§ 1, 2, it will only be found to be so if there is established joint conduct among participating exhibitors which unreasonably restrains trade. *See, e. g., Admiral Theater Corp. v. Douglas Theater Co.*, 585 F.2d 877 (8th Cir. 1978); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir. 1971); *Twentieth Century-Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964).

■ The Ohio Act neither requires nor authorizes collusive conduct of any kind among exhibitors. The plaintiffs paint a picture of what could happen and complain simply that the Act makes such happening more apt to occur. Thus they portray the "sort of hypothetical conflict [that] is not sufficient to warrant pre-emption," discredited by the Supreme Court in *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117, 131, 98 S.Ct. 2207, 2216, 57 L.Ed.2d 91 (1978). Addressing the contention that compliance with a Maryland statute regulating petroleum distribution might require appellants to charge uniform prices in circumstances where price discrimination would otherwise be permitted by the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C. § 13(b) (1976 ed.), the Supreme Court stated:

> But "[i]n this as in other areas of coincident federal and state regulation, the 'teaching of this Court's decisions . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.' *Huron Cement Co. v. Detroit*, 362 U.S. 440, 446 [, 80 S.Ct. 813, 817,

4 L.Ed.2d 852.]" *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 45 [, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336.] See also *State v. Texaco, Inc.*, 14 Wis.2d 625, 111 N.W.2d 918 (1961). The Court in *Seagram & Sons* went on to say that "[a]lthough it is possible to envision circumstances under which price discriminations proscribed by the Robinson-Patman Act might be compelled by [the state statute], the existence of such potential conflicts is entirely too speculative in the present posture of this case" to warrant preemption. 384 U.S., at 46 [, 86 S.Ct. at 1261.] That counsel of restraint applies with even greater force here. For even if we were to delve into the hypothetical situations posed by appellants, we would not be presented with a state statute that requires a violation of the Robinson-Patman Act. Instead, the alleged "conflict" here is in the possibility that the Maryland statute may require uniformity in some situations in which the Robinson-Patman Act would *permit* localized discrimination. This sort of hypothetical conflict is not sufficient to warrant pre-emption.

*Exxon Corporation, supra*, at 130–31, 98 S.Ct. at 2216 (footnotes omitted). In this case, the plaintiffs allege that the Ohio Act may encourage exhibitors to violate the Sherman Act. It neither requires nor permits such conduct. Nor does it preclude plaintiffs from proceeding under the Sherman Act against exhibitors who commit the unlawful acts. The Ohio Act will not immunize exhibitors from application of the Sherman Act in any case where "the private party exercise[s] sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 593, 96 S.Ct. 3110, 3119, 49 L.Ed.2d 1141 (1976). *See also Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966). The plaintiffs' theory with respect to product splitting is without merit.

██ Plaintiffs' second attack concerns the open-bidding procedures mandated by R.C. 1333.07(E) and (F).

The theory advanced is that the disclosure of bid terms to all bidding exhibitors is anticompetitive because bidding loses all competitive qualities if individual bidders know or have access to the contents of their competitors' bids and act on that information to limit competition. As is true with product splits, it is equally clear that when such collusion occurs, it may well be violative of the Sherman Act. See *United States v. Container Corporation of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). But I am not convinced that the mere availability of such information to Ohio exhibitors will produce the kind of interference with competitive market forces that plaintiffs foresee.

In the case relied on by plaintiffs, *Container Corporation, supra*, the Supreme Court found that the exchange of price information between manufacturers of corrugated fiber boxes had an anticompetitive effect in the industry, chilling the vigor of price competition. The opinion does not establish a *per se* rule that the exchange of information is anticompetitive. The Court expressly found agreement and an effect on prices.

Analyzing the particular market situation presented in that case, the court inferred that the exchange of information had the effect of a price maintenance agreement. The defendants were 18 southeastern manufacturers who accounted for 90% of the production in the particular market area. The author of the opinion, Mr. Justice Douglas, noted the peculiar effect of information exchanges on price movement in an oligopolistic, inelastic market:

> Price information exchanged in some markets may have no effect on a truly competitive price. But the corrugated container industry is dominated by relatively few sellers. The product is fungible and the competition for sales is price. The demand is inelastic, as buyers place orders only for immediate, short-run needs.

*Id.* at 337, 89 S.Ct. at 512. In the motion picture distribution industry, competition

among exhibitors is fierce. They are relatively unconcentrated and vie for an ever-changing product on the basis of a variety of different terms. Their market more closely resembles a competitive model. Moreover, the product is not fungible; to the contrary, each motion picture is unique. Given these facts, I cannot draw the inference that open bidding without further action among exhibitors on the information thereby gained to limit competition will have any effect on licensing terms.

The Supreme Court has clearly not retreated from the principle of *Maple Flooring Manufacturers Assn. v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925) and *Cement Manufacturers Protective Assn. v. United States*, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925) that the "gathering and dissemination of pertinent information with respect to the sale and distribution" without concerted action or an effect on price and market "are not in themselves unlawful restraints upon commerce and are not prohibited by the Sherman Act." *Id.* at 606, 45 S.Ct. at 592. In *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975), the court reaffirmed that "the dissemination of price information is not itself a *per se* violation of the Sherman Act."

Finally, the Supreme Court's recent rejection of an interpretation of the Robinson-Patman Act that would place an affirmative duty on a buyer to inform a seller of competing bids as anticompetitive is inapposite here. *See Great A & P Tea Co. v. FTC*, 440 U.S. 69, 80–81, 99 S.Ct. 925, 933–34, 59 L.Ed.2d 153 (1979). This Court is constrained to heed the caution "against applying standards developed for accommodation within the federal system to the very different context of federal/state conflict." 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 214a, at 83 n.11 (1978). The Supreme Court was guided in *A & P* by its prior pronouncements concerning expansive interpretations of the Robinson-Patman Act. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Automatic Canteen Co. of America v. FTC*, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1961). Once again, it is simply too speculative to read the Act's disclosure requirements as anti-competitive where antitrust implications arise only after further acts of private persons—acts that are not in evidence here.

As with product splitting discussed above, any exhibitors who use the information available to them under the Ohio Act for purposes unlawful under federal laws are subject to liability under them.

■ Finally, plaintiffs complain that by prohibiting the conditioning of license agreements on the payment of guarantees the Ohio Act works an anti-competitive effect because it removes an "important competitive tool" from the exhibition market. Plaintiffs argue that guarantees perform an important function in permitting new, small exhibitors to enter an established market because the plaintiffs will overlook such factors as the absence of an attractive track record, or established clientele, if a new bidder promises a large guarantee. In the case of a new exhibitor, since the potential audience is apt to be small, other enticements, such as a larger percentage of box office receipts, are unlikely to lure the distributor away from existing exhibitors. Plaintiffs contend that the state is attempting by way of legislation to do what exhibitors, working together, are forbidden from doing by the Sherman Act: to contract, combine or conspire in restraint of trade. *See Schwegmann Bros. v. Calvert Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

The argument is not without appeal but overlooks the recent statement by the Supreme Court in *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117, 133, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978) and reiterated in *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 110–11, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978), that:

This is merely [another way of stating that the Maryland] statute will have an anticompetitive effect. In this sense, there is a conflict between the statute and the central policy of the Sherman

Act—our "charter of economic liberty." [*Northern Pacific R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545.] Nevertheless, this sort of conflict cannot itself constitute a sufficient reason for invalidating the Maryland statute. *For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed.* (Emphasis added.)

Whether this Act would satisfy the standards for "state action exemption" set down by the Supreme Court in the recent case of *California Retail Liquor Dealers v. Midcal*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court need not decide. For the argument must be rejected on factual grounds.

A close reading of the statute reveals that it does not prohibit all guarantees, or even the conditioning of all license agreements on the granting of a guarantee. Rather, the Act only prohibits the conditioning of license agreements on the payment of a guarantee where film rental is also sought. Presumably, then, a new exhibitor, whose box office success is not yet proven, can still offer a guarantee as a method for obtaining a license which might otherwise go to an established theater.

Moreover, it appears that the effect of the guarantee provision is to foster competition among exhibitors, large and small. Under prior practice, it was normally only the large exhibitors who were able to afford to pay the large guarantees formerly demanded by the plaintiffs and thus were virtually assured of receiving the most attractive films for first-run release. The guarantee provision of the Act tends to put exhibitors on a more equal footing with each other, thus encouraging competition consistent with the Sherman Act.

The other challenged provisions have similar purposes and effects. The open disclosure to exhibitors of the terms of their competitors' bids serves to remove the suspicion inherent earlier that licenses were not being awarded fairly and serves to eliminate the possibility that deals would not be made in an open, competitive market. By revealing to all exhibitors information that was formerly available on occasion to larger exhibitor chains,[21] it strengthens the competitive position of small one-theater exhibitors. Likewise, plaintiffs recognize in their trial brief, at 104, that "[p]rice competition is furthered when competitors individually determine the profit-making potential of a film in their theaters and bid accordingly." As has been discussed above, the Act's blind bidding prohibition and trade screening requirements are designed to afford an exhibitor the only effective method to render his own determination as to a film's profit-making potential and thus to compete fairly with other exhibitors.

The Supreme Court's admonition in *Exxon Corporation* could not be more appropriate:

This Court is generally reluctant to infer preemption, see *e. g., DeCanas v. Bica*, 424 U.S. 351, 357–358, n.5 [96 S.Ct. 933, 937–38, 47 L.Ed.2d 43]; *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127 [94 S.Ct. 383, 390, 38 L.Ed.2d 348], and it would be particularly inappropriate to do so in this case because the basic purposes of the state statute and the Robinson-Patman Act are similar. Both reflect a policy choice favoring the interest in equal treatment of all customers over the interest in allowing sellers freedom to make selective competitive decisions.

437 U.S. at 132–33, 98 S.Ct. at 2217.

The Ohio Act is designed to and does foster competitive policies of the Sherman Act. It is not inconsistent with, and is therefore not preempted by that federal law.

---

**21.** The evidence indicates that large exhibitors have the means to gain information about a motion picture and license terms that small exhibitors cannot. *See, e. g.,* Tr. XI–66; XVII–

**32–34.** The most obvious example is the ability of the larger exhibitor with theaters in several states to use information gained from licensing in one state when licensing in other states.

**452**

## VIII. *Conclusion*

Plaintiffs brought this action because the Ohio Act interferes with the broad discretion they formerly exercised in the marketing and distribution of their motion pictures within the state. After reviewing all the evidence in the case, the Court is persuaded that the burdens actually imposed on the plaintiffs by the Act and the changes it makes in their operations are not of constitutional dimension.

The Act orders by legal mandate which methods will be used in Ohio for the distribution of plaintiffs' films, and in so doing it limits the choices available to the plaintiffs in selecting the most effective and most profitable methods to license and distribute their product.

Some may consider the decision by the Ohio General Assembly thus to inhibit free market forces in the motion picture industry unwise. See , e. g., Note, "Blind Bidding and the Motion Picture Industry," 92 Harv.L.Rev. 1128, 1147 (1979). But the wisdom of a law is a question to be presented and resolved by political bodies, not by this Court. As stated above, this Court cannot "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). "Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

Trade practices legislation such as that challenged here, ought to survive judicial scrutiny unless it unduly impinges on rights guaranteed by the Constitution or federal laws. The Court has searched in vain for such rights that have been thus transgressed.

Neither the Commerce Clause, nor the First Amendment, nor the copyright or antitrust laws guarantee the plaintiffs unfettered discretion to license their films as they please. Nothing in any of the consti-

tutional grounds advanced by plaintiffs prevents the State of Ohio, upon perceiving that unregulated market forces have resulted in economic hardship to local businesses, from altering trade practices to rectify the imbalance.

Accordingly, I hold that R.C. 1333.05–.07 are constitutional and may be enforced. All the issues are joined in favor of the defendant and against the plaintiffs in this action, and judgment will be entered for the defendant.